399 F.Supp.2d 261 (2005)
In re: INITIAL PUBLIC OFFERING SECURITIES LITIGATION
This document relates to: Amy Liu, Robert Tenney, Robert Tate, Mary Gorton, Carla Kelly, Henry Ciesielski, Ed Grier, Frank Turk, Jennie Papuzza, Stanley Warren, Ellen Dulberger, Craig Mason, and Sharon Brewer, Plaintiffs,
v.
Credit Suisse First Boston Corp., Credit Suisse First Boston (USA), Inc., Credit Suisse First Boston, Credit Suisse Group, Efficient Networks, Inc., eMachines, Inc., Lightspan Partnership, Inc., Tanning Technology Corp., and Tumbleweed Communications Corp., Defendants.
Nos. MDL 1554(SAS). 21 MC 92(SAS), 04 Civ. 3757(SAS).
United States District Court, S.D. New York.
May 13, 2005.
*262 John G. Watts, Yearout & Traylor, P.C., Birmingham, AL, for Plaintiffs.
Kristin Linsey Myles, Robert L. Dell Angelo, Munger, Tolles & Olson LLP, San Francisco, CA, Michael L. Hirschfeld, John A. Boyle, Milbank, Tweed, Hadley & McCloy LLP, New York City, Randall J. Clement, Sheppard, Mullin, Richter & Hampton LLP, Costa Mesa, CA, Mitchell E. Herr, Holland & Knight LLP, Miami, FL, for Issuer Defendants.
Peter K. Vigeland, Robert W. Trenchard, Wilmer, Cutler & Pickering, New York City, for CSFB Defendants.

OPINION AND ORDER
SCHEINDLIN, District Judge.
I. INTRODUCTION
In an Opinion and Order dated April 1, 2005, this Court dismissed plaintiffs' claims in this action, No. 04 Civ. 3757, in their entirety.[1] Plaintiffs now move for reconsideration.[2]
II. LEGAL STANDARD
A motion for reconsideration is governed by Local Rule 6.3 and is appropriate where a court overlooks "controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court."[3] Alternatively, a motion for reconsideration may be granted to "correct a clear error or prevent manifest injustice."[4]
Local Rule 6.3 should be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court."[5] A motion for reconsideration "is not a substitute for appeal."[6] Courts have repeatedly *263 been forced to warn counsel that such motions should not be made reflexively, "to reargue those issues already considered when a party does not like the way the original motion was resolved."[7] The purpose of Local Rule 6.3 is to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters."[8]
III. DISCUSSION
A. Transaction Causation
Plaintiffs rest their motion for reconsideration primarily on a single premise: that the Court misinterpreted the true meaning of plaintiffs' allegations regarding price increases and artificial inflation.[9] Plaintiffs now maintain that all references to price increases contained in their Third Amended Complaint and motion papers[10] should have been construed as allegations of artificial inflation, not literal price increases.[11] Plaintiffs argue extensively that *264 one particular allegation of actual price increaseswhich appeared in the section of the Third Amended Complaint summarizing plaintiffs' claimswas misconstrued by the Court.
The disputed allegation reads:
The purposes and effect of said scheme was to create the illusion of ever rising stock prices so that Bank Defendants could profit from the sale of resulting over-priced securities owned by them, profit from increased underwriting and market making fees resulting from the price manipulation, and induce Plaintiffs and the members of the Class to purchase common stock at artificially inflated prices.[12]
Plaintiffs assert that this grammatically incoherent sentence should be parsed to mean that defendants merely intended to create an illusion and to profit from it, and that the last "purpose"and the only "effect" "was to `induce Plaintiffs . . . to purchase common stock at artificially inflated prices.'"[13] Plaintiffs also offer a wealth of citations from their Third Amended Complaint using the terms "artificial inflation," "positive impact" or "positive effect" to establish that plaintiffs did not really mean that prices themselves went up during the class period, but rather that the alleged misrepresentations built some artificial premium into share prices that dissipated when a disclosing event occurred.
In my April 1, 2005, Opinion, I found that "plaintiffs' theory of causation depends not just on the content of individual misstatements creating misleading information about market value, but rather on beliefs caused by the confluence of depressed projections, conditioning statements, upside surprises and observed increases in stock prices."[14] Plaintiffs now argue that "[w]hether the Defendants were successful in their purpose of `creating the illusion of ever rising stock prices' is [] irrelevant."[15] Essentially, plaintiffs now contend that the alleged scheme caused price inflationi.e., caused stocks to trade at a higher price than they would have absent the schemerather than actual increases in price. Under this theory, actual stock price declines would not necessarily contradict a theory of artificial inflation. As Judge Gerard Lynch of this Court has noted, "[t]he fact of gradual price decline is not inconsistent with the theory that the price was artificially inflated, since the misrepresentations may well have buoyed a price that would otherwise have sunk much faster, thus raising the price at which plaintiffs purchased the stock."[16]
Consequently, if plaintiffs' latest attempts to recast their allegations are credited, trading data that fails to show any relationship between upside surprises and rising stock prices does not by itself destroy plaintiffs' allegations of artificial inflation. In light of plaintiffs' new interpretation, plaintiffs' allegations that defendants intended to create "upward price momentum"[17] and "the illusion of ever *265 rising stock prices"[18] must be understood to allege that defendants triedbut often failedto create actual price increases. Indeed, it is not surprising that earnings reports that exceeded estimates failed to create much market excitement, because the so-called "conditioning statements" allegedly made by defendants cautioned investors that the estimates were likely to be beaten. It is thus difficult to discern how such a schemecharacterized by issuing depressed earnings estimates, cautioning consumers that the estimates were likely to be too low, and then beating the estimates without any reliable quickening of actual share pricescould have artificially inflated the prices of the securities at issue. However, regardless of how difficult it may be for plaintiffs to prove that the alleged scheme caused their losses, their latest revisions at least allege that the scheme caused some artificial inflation.
B. Loss Causation
It is now clear, however, that plaintiffs cannot satisfactorily allege loss causation simply by alleging that they purchased securities at artificially inflated prices.[19] On April 19, 2005, in Dura Pharmaceuticals, Inc. v. Broudo,[20] the Supreme Court rejected the Ninth Circuit's permissive pleading standard for loss causation, which required only that a plaintiff allege that she had bought a security at an artificially inflated price.[21] The Court noted that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid."[22]
In the Second Circuit, "a plaintiff must allege something more than merely artificial inflation [to plead loss causation adequately]."[23] However, "a plaintiff need not allege a totally independent basis for her loss in addition to artificial inflation; if that were the case, then allegations of artificial inflation would be superfluous."[24] Nonetheless, "in material misstatement and omission cases, a court cannot presume dissipation of the inflationary effect; a plaintiff must explicitly allege a disclosure or some other corrective event."[25] *266 Moreover, "to establish loss causation, `a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."[26]
It is vital to understand the scheme that plaintiffs allege was concealed from the market. Plaintiffs allege that the defendants intentionally discounted earnings estimates and issued cautionary statements to excite the market and inflate prices when those estimates were beaten. To allege loss causation, plaintiffs must allege that, at some point, the concealed scheme was disclosed to the market.
Plaintiffs allege that "when each Issuer failed to continue the trend which had been established since the IPO of consecutively and sequentially posting actual revenue results that exceeded those which had been forecasted, the fraud effectively ended and purchasers of the inflated stocks were damaged."[27] Plaintiffs point to three types of "Disclosing Events" that purportedly disclosed the fact of the alleged fraud: (1) reports of quarterly revenues that failed to exceed forecasts; (2) announcements prior to quarterly reports that the Issuer would fail to meet forecasts; and (3) downward revisions of the analysts' own published estimates.[28] Plaintiffs assert that, whenever a Disclosing Event occurred, "the fraudulently induced expectation of continuing upside surprises ended."[29]
That expectation, though, is not the scheme plaintiffs allege. It is merely an expression of the market's belief that the securities were valuable. The fact that an eventin this case, a failure to meet earnings forecasts or a statement foreshadowing such a failuredisabused the market of that belief does not mean that the event disclosed the alleged scheme to the market. In other words, a failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect.[30] Such a failure does not imply that defendants concealed a scheme to depress earnings estimates and drive up prices. It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme.[31]
Because plaintiffs do not allege that the scheme was ever disclosed, they fail to allege loss causation. Although plaintiffs' latest reinterpretation of their Third Amended Complaint alleges that defendants' omissions and misrepresentations artificially inflated share prices, it does not allege any disclosure that would correct those omissions or misrepresentations. If downturns in stock prices based on such *267 mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses. That would effectively convert the securities laws into an insurance policy for investors. "But the statutes make [private securities fraud actions] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."
It is illustrative to consider what kind of event could have disclosed the actual fraud alleged, thereby permitting a determination of whether the alleged fraud actually caused any losses. In the context of plaintiffs' earlier motion for leave to amend, in which defendants asserted that press accounts of IPO underpricing placed plaintiffs on inquiry notice of the alleged scheme, defendants uncovered a single article that referred to the type of discounting alleged by plaintiffs. At that time, I noted:
In the April 23, 2000 Sunday Times of London, the following language appeared:
"Chuck Hill, research director at First Call, a firm that collates analysts' estimates, condemns another increasingly common and deceptive practice of deliberately understating a company's expected earnings."
"He says: `Nowadays it is imperative not to miss your estimates (because the market will punish the stock). More and more firms are giving (confidential) low-ball guidance figures to analysts, knowing they can beat them. It is naive and it is going to end badly.'"[32]
Although that single article, standing alone, was not specific enough to constitute actual disclosure of the alleged fraud with respect to any of the Issuers,[33] a similar release stating that one of the Issuers had engaged in such behavior could have constituted a disclosing event. Plaintiffs allege no such disclosures. The lack of such disclosuresand, accordingly, any sufficient allegations of loss causationdooms plaintiffs' Third Amended Complaint.
IV. CONCLUSION
For the foregoing reasons, plaintiffs' motion to reconsider is granted in part. The discussion contained in this Opinion supplements the April 1, 2005 Opinion with respect to its discussion of transaction causation and loss causation. For the reasons stated in this Opinion and my April 1 Opinion, plaintiffs' Third Amended Complaint is dismissed. Defendants may submit letters in support of their contention that sanctions should be granted, not to exceed a total of ten pages for all defendants, by May 27, 2005. Plaintiffs' response, if any, is due June 6, 2005.
SO ORDERED.
NOTES
[1] See In re Initial Public Offering Sec. Litig. ("In re IPO"), 383 F.Supp.2d 566 (S.D.N.Y. 2005) ("Liu II").
[2] Plaintiffs have styled their motion as a "Rule 59(e) Motion to Alter, Amend, or Vacate the Order of April 1, 2005, Dismissing the Plaintiffs' Complaint." The motion seeks substantially the same relief as a motion for reconsideration under Local Rule 6.3. Indeed, because plaintiffs filed within the ten-day period prescribed by Rule 59(e), whether they styled their motion as one under Local Rule 6.3 or Rule 59(e) is immaterial. See Lichtenberg v. Besicorp Group Inc., 204 F.3d 397, 401 (2d Cir.2000) ("A postjudgment motion requesting alteration or amendment of the judgment but denominated a motion under a rule other than Civil Rule 59(e) is generally treated as having been made under Rule 59(e), thereby extending the time to appeal, if the motion was filed within the 10-day period allowed for a Rule 59(e) motion."); see also id. at 404 (Winter, C.J., dissenting) ("Local Rule 6.3 simply adds flesh to the skeletal procedure set out in Civil Rule 59(e)").
[3] Range Road Music, Inc. v. Music Sales Corp., 90 F.Supp.2d 390, 392 (S.D.N.Y.2000) (quotation marks and citation omitted). See also Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir.1995) ("The standard for granting ... a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.").
[4] Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782, 789 (2d Cir.1983).
[5] Dellefave v. Access Temps., Inc., No. 99 Civ. 6098, 2001 WL 286771, at *1 (S.D.N.Y.2001).
[6] RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 207 F.Supp.2d 292, 296 (S.D.N.Y.2002) (quotation omitted).
[7] Houbigant, Inc. v. ACB Mercantile, 914 F.Supp. 997, 1001 (S.D.N.Y.1996).
[8] Carolco Pictures, Inc. v. Sirota, 700 F.Supp. 169, 170 (S.D.N.Y.1988).
[9] In addition to their arguments regarding causation, plaintiffs also assert that the April 1 Opinion overlooked some misrepresentations made during the IPO process in dismissing the Third Amended Complaint. See Plaintiffs' Memorandum of Law in Support of the Rule 59(e) Motion to Alter, Amend, or Vacate ("Pl.59(e) Mem.") at 10-11. However, plaintiffs' case was dismissed for a failure to plead causation adequately; no matter how many misrepresentations are alleged or considered, a failure to plead that the scheme caused plaintiffs' losses mandates dismissal.
[10] Plaintiffs allege that defendants worked together to create, publish and disseminate artificially depressed earnings estimates that, when beaten by actual results, created upward momentum in stock prices and conditioned the market to believe that estimates would always be beaten. See, e.g., Plaintiffs' Response in Opposition to Defendants' Motions to Dismiss ("Pl.Opp.") at 36 ("Plaintiffs make [allegations regarding prospectus misstatements] to provide support for their claims that Defendants engaged in an ongoing, consistent scheme of depressing revenue projections to achieve quick and sustained growth in share prices.") (quoting In re IPO, 341 F.Supp.2d 328, 348 n. 185 (S.D.N.Y. 2004)) ("Liu I") (emphasis added); id. at 59 ("Plaintiffs' complaint alleges that Defendants' manipulative scheme was successful in its intent to get each of the Issuer Defendant[s'] stock to `Perform' to some degree above the IPO price ... [and] alleges that Defendants' manipulative scheme was successful in its intent to condition stock prices to rise in anticipation of forecasts being exceeded."); id. at 62 (The intent was to prime the market to expect (anticipate) that the surprise would occur and keep occurring indefinitely). As the TAC states: `During the class period, stock prices of technology IPO Stocks rose in anticipation of forecasts being exceeded by actual results.' (emphasis in Pl. Opp.) (quoting Third Amended Complaint ("TAC") ¶ 222); TAC ¶ 1 (scheme was intended "to create upward price momentum"); id. ¶ 90 ("scheme was to manufacture the perception among buyers that large economic returns accrued to holders of an Issuer's stock" after each IPO); id. ¶ 100 (defendants promised their customers that their "stocks continued to increase in price in the subsequent days and months beyond the first day's closing price"); id. ¶ 114 ("CSFB fraudulently understated revenue data in order for the Issuer's stock price to increase .... "); id. ¶ 212 (intended effect "was to directly affect the price of an Issuer's stock by falsely causing the stock price to jump substantially on the day of the IPO and then falsely causing it to continue to rise and/or to sustain growth in subsequent months"); id. ¶ 224 (CSFB repeatedly "revised its [earnings] forecasts to create a spike").
[11] Plaintiffs thus focus on the causation section of the April 1 Opinion, in which this Court found that plaintiffs' allegations of continuing price increases in conjunction with the alleged misstatements and omissions were flatly contradicted by judicially noticeable trading data.
[12] TAC ¶ 256. See also id. ¶ 267 ("The purposes and effect of said scheme was to create the illusion of ever-rising stock prices so that Issuer Defendants could profit from the sale of resulting over-priced securities owned by them and induce Plaintiffs and the members of the Class to purchase common stock at artificially inflated prices.").
[13] Pl. 59(e) Mem. at 4 (quoting TAC ¶ 256) (alteration in Pl. 59(e) Mem.).
[14] Liu II, at 585-86.
[15] Pl. 59(e) Mem. at 4.
[16] DeMarco v. Robertson Stephens, Inc., 318 F.Supp.2d 110, 124 (S.D.N.Y.2004).
[17] TAC ¶ 1 (summarizing the central elements of the alleged scheme).
[18] Id. ¶¶ 256, 267 (setting forth the basis for plaintiffs' claims against the CSFB defendants and Issuer defendants respectively).
[19] In my April 1 Opinion, I noted that the Supreme Court had not yet ruled on the appropriate standard for pleading loss causation in the securities fraud context. See Liu II, at 577-78.
[20] ___ U.S. ____, ____, 125 S.Ct. 1627, 1630, 161 L.Ed.2d 577 (2005).
[21] See Broudo v. Dura Pharms., Inc., 339 F.3d 933, 938 (9th Cir.2003).
[22] Dura, 125 S.Ct. at 1634.
[23] Fogarazzo v. Lehman Bros., 341 F.Supp.2d 274, 287 (S.D.N.Y.2004) (footnote omitted). See also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., 343 F.3d 189, 198 (2d Cir. 2003) (holding "that a purchase-time loss allegation alone could [not] satisfy the loss causation pleading requirement") (emphasis in original); cited with approval by Dura, 125 S.Ct. at 1630. Dura itself does not define a pleading standard for loss causation; rather, it simply rejects the Ninth Circuit's standard as overly permissive. Accordingly, the Second Circuit's standardwhich certainly requires "a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," id. at 1634is undisturbed by Dura.
[24] Fogarazzo, 341 F.Supp.2d at 287 (emphasis in original).
[25] In re IPO, 297 F.Supp.2d 668, 673 (S.D.N.Y.2003) (footnote omitted).
[26] Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir.2005) (citation omitted) (emphasis in original) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir.2001)). See also Fogarazzo, 341 F.Supp.2d at 289 (noting that courts have found plaintiffs sufficiently pleaded loss causation where "defendants['] misrepresentations [ ] went to the value of the security" and "the ultimate decline in the companies' stock price was attributable to the very thing that the defendants allegedly lied about").
[27] TAC ¶ 225.
[28] Id. ¶¶ 225, 227.
[29] Id. ¶ 225.
[30] In my first opinion in this case I noted that

each Disclosing Event was the unfortunate but commonplace event of a publicly traded company failing to meet its revenue forecast, coupled with a concomitant and predictable immediate drop in share prices. Such an event could not alone have led a reasonable investor to believe that the market for her stock had been artificially buoyed through a well-coordinated scheme of discounting revenue forecasts.
Liu I, 341 F.Supp.2d at 350.
[31] See Lentell, 396 F.3d at 173.
[32] Liu I, 341 F.Supp.2d at 349 (footnotes omitted).
[33] See id. ("However, although the article does specifically refer to high-technology `bubble' stocks, it makes no mention of any of the Issuers by name, and does not suggest that CSFBC or any of the other Defendants were engaging in the practice of deliberately underestimating a company's expected earnings. Moreover, the article does not claim that the low-ball figures were disseminated to the public.").