In re: INITIAL PUBLIC OFFERING SECURITIES LITIGATION

This document relates to:

Amy Liu, Robert Tenney, Robert Tate, Mary Gorton, Carla Kelly, Henry Ciesielski, Ed Grier, Frank Turk, Jennie Papuzza, Stanley Warren, Ellen Dulberger, Craig Mason, and Sharon Brewer, Plaintiffs,

v.

Credit Suisse First Boston Corp., Credit Suisse First Boston (USA), Inc., Credit Suisse First Boston, Credit Suisse Group, Efficient Networks, Inc., eMachines, Inc., Lightspan Partnership, Inc., Tanning Technology Corp., and Tumbleweed Communications Corp., Defendants.

No. MDL 1554(SAS).
21 MC 92(SAS).

United States District Court,
S.D. New York.

June 28, 2005.

John G. Watts, Yearout & Traylor, P.C., Birmingham, AL, for Plaintiffs.

Kristin Linsey Myles, Robert L. Dell Angelo, Munger, Tolles & Olson LLP, San Francisco, CA, Michael L. Hirschfeld, John A. Boyle, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Randall J. Clement, Sheppard, Mullin, Richter & Hampton LLP, Costa Mesa, CA, Mitchell E. Herr, Holland & Knight LLP, Miami, FL, for Issuer Defendants.

Peter K. Vigeland, Robert W. Trenchard, Wilmer, Cutler & Pickering, New York, NY, for CSFB Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

In an Opinion and Order dated April 1, 2005, this Court dismissed plaintiffs' claims

in this action, No. 04 Civ. 3757, in their entirety.[1] Plaintiffs moved for reconsideration. On May 13, 2005, I granted plaintiffs' motion in part, but reaffirmed the dismissal of plaintiffs' claims because plaintiffs had failed to plead loss causation.[2] Plaintiffs now move for reconsideration of the May 13 Opinion.[3]

## II. LEGAL STANDARD

A motion for reconsideration is governed by Local Rule 6.3 and is appropriate where a court overlooks "controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court."[4] Alternatively, a motion for reconsideration may be granted to "correct a clear error or prevent manifest injustice."[5] Reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."[6]

Local Rule 6.3 should be "narrowly construed and strictly applied" to avoid repetitive arguments on issues that have been considered fully by the Court.[7] A motion for reconsideration "is not a substitute for appeal;"[8] nor is it "a 'second bite at the apple' for a party dissatisfied with a court's ruling."[9] Courts have repeatedly been forced to warn counsel that such motions should not be made reflexively, "to reargue those issues already considered when a party does not like the way the original motion was resolved."[10] A motion under Local Rule 6.3 "shall be served within ten (10) days after the entry of the court's order determining the original motion."[11]

On April 19, 2005, in *Dura Pharmaceuticals, Inc. v. Broudo*,[12] the Supreme Court rejected the Ninth Circuit's permissive

**1.** See *In re Initial Public Offering Sec. Litig.* ("*In re IPO*"), 383 F.Supp.2d 566 (S.D.N.Y. 2005) ("*Liu II*").

**2.** See *In re IPO*, 399 F.Supp.2d 261 (S.D.N.Y. 2005) ("*Liu Reconsideration*").

**3.** See Plaintiffs' Memorandum in Support of the Rule 59(e) Motion to Alter, Amend, or Vacate the Order of May 13, 2005, Dismissing the Plaintiffs' Complaint ("2d Reconsideration Mem."). As they did in their first motion for reconsideration, plaintiffs have styled their motion under 59(e) rather than Local Rule 6.3. As I noted in my May 13 Opinion, there is no difference between the two. *See Liu Reconsideration*, 399 F.Supp.2d at 261, 2005 WL 1162445, at *1.

**4.** *Range Road Music, Inc. v. Music Sales Corp.*, 90 F.Supp.2d 390, 392 (S.D.N.Y.2000) (quotation marks and citation omitted). See also *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995) ("The standard for granting . . . a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.").

**5.** *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.1983).

**6.** *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000).

**7.** *Greenes v. Vijax Fuel Corp.*, No. 02 Civ. 450, 2004 WL 1516804, at *1 (S.D.N.Y. July 7, 2004).

**8.** *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 207 F.Supp.2d 292, 296 (S.D.N.Y.2002) (quotation omitted).

**9.** *Pannonia Farms, Inc. v. USA Cable*, No. 03 Civ. 7841, 2004 WL 1794504, at *2 (S.D.N.Y. Aug.10, 2004).

**10.** *Houbigant, Inc. v. ACB Mercantile*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

**11.** S.D.N.Y. Local Rule 6.3. *See also* Fed. R.Civ.P. 59(e) (same).

**12.** —— U.S. ——, 125 S.Ct. 1627, 1630, 161 L.Ed.2d 577 (2005).

pleading standard for loss causation, which required only that a plaintiff allege that she had bought a security at an artificially inflated price.[13] The Court noted that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid."[14] *Dura* did not establish what *would* be a sufficient loss causation pleading standard; it merely established what was *not*. However, *Dura* cited the stricter standards of the Second, Third, Seventh and Eleventh Circuits' standards as those with whom "the Ninth Circuit's views about loss causation differ."[15] The Court did not explicitly modify the stricter standards of those Circuits when it rejected the Ninth Circuit's lenient standard; accordingly, *Dura* did not disturb Second Circuit precedent regarding loss causation.

## III. PLAINTIFFS' ARGUMENT

Plaintiffs' second motion for reconsideration focuses on the Court's May 13 decision that plaintiffs had not adequately pled loss causation.[16] Essentially, plaintiffs contend that the Court misconstrued the relevant legal standard for loss causation, as articulated in the Second Circuit's decision in *Lentell v. Merrill Lynch & Co., Inc.*[17] In the May 13 Order, I noted that:

in material misstatement and omission cases, a court cannot presume dissipation of the inflationary effect; a plaintiff must explicitly allege a disclosure or some other corrective event. Moreover, to establish loss causation, a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.[18]

Plaintiffs contend that *Lentell* simply requires "that the Plaintiffs' Complaint alleges facts to support that the misstatements or omissions were the 'proximate cause' ... of the investment loss."[19] Plaintiffs contend that, under *Lentell*, " 'proximate cause' is construed broadly, except that it logically requires that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."[20] Plaintiffs argue that the corrective disclosure requirement of *Lentell* was in fact just one of several possible ways for plaintiffs to allege loss causation, and that plaintiffs'

---

**13.** *See Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938 (9th Cir.2003).

**14.** *Dura*, 125 S.Ct. at 1634.

**15.** *Id.* at 1630 (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir.2003)).

**16.** Plaintiffs also quibble with the Court's description of the alleged scheme, devoting four pages to the proposition that "the artificial inflation occurred *before* the actual results were announced to have beaten the preexisting estimates." 2d Reconsideration Mem. at 8. Because plaintiffs have not sufficiently alleged that the alleged scheme caused their losses,

the exact timing of the alleged artificial inflation is irrelevant. Moreover, to the extent that plaintiffs now raise questions of transaction causation that were addressed in my April 1, 2005 Order, the ten-day deadline for reconsideration motions has expired. *See* S.D.N.Y. Local Rule 6.3; Fed.R.Civ.P. 59(e).

**17.** 396 F.3d 161 (2d Cir.2005).

**18.** *Liu Reconsideration*, 399 F.Supp.2d at 265-66, 2005 WL 1162445, at *3 (footnotes and quotation marks omitted).

**19.** 2d Reconsideration Mem. at 5.

**20.** *Id.*

failure to allege any corrective disclosures has no effect on any of the other methods by which plaintiffs may adequately plead loss causation.[21]

Plaintiffs' confusion is understandable. As the Second Circuit noted in *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* the Circuit has produced "somewhat inconsistent precedents on loss causation."[22] Indeed, although the Circuit has issued several opinions dealing with loss causation in the last few years, the standard remains ambiguous.[23]

## IV. DISCUSSION

### A. Reconciling the Second Circuit's Loss Causation Standard

■ The Circuit's most recent decision on loss causation, *Lentell v. Merrill Lynch,* notes that "we follow the holdings of [three earlier Second Circuit cases,] *Emergent Capital, Castellano* and *Suez Equity.*"[24] *Lentell's* loss causation standard, though, is difficult to parse. To begin, *Lentell* holds that:

> Thus to establish loss causation, "a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered," i.e., that the misstatement or

omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable.[25]

But *Lentell's* full discussion of loss causation spans several pages, at times asserting different formulations of the loss causation standard. For example, the *Lentell* decision later posits that "[t]his Court's cases—post-*Suez* and pre-*Suez*—require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk."[26] On the next page of the decision, the court continues to reformulate its standard, noting that "our precedents make clear that loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant. If that relationship is sufficiently direct, loss causation is established...."[27] Finally, *Lentell* also states the loss causation standard in the negative: "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality."[28]

---

21. *See id.* at 5–6 (summarizing plaintiffs' apprehension of the *Lentell* test as follows: "[1] was the subject of those 'misstatements and omissions' the cause of the decline in stock values that Plaintiffs claim as their loss? or [2] was there any corrective disclosure regarding the falsity of those 'misstatements and omissions' so as to cause [ ] the decline in stock values that Plaintiffs claim as their loss?[ ] or [3] have Plaintiffs alleged that the Defendants concealed or misstated any risks associated with an investment in those securities, some of which presumably caused Plaintiffs' losses?") (bracketed numbers in original).

22. 250 F.3d 87, 98 n. 1 (2d Cir.2001).

23. *See Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 187 ("While loss causation is easily defined, its application to particular

facts has often been challenging."); *Emergent Capital,* 343 F.3d at 198 (including a section entitled *"Suez Equity* Clarified"); *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir.2005) ("acknowledg[ing] that [the] opinion in *Suez Equity* can be (mis-)read").

24. *Lentell,* 396 F.3d at 174.

25. *Id.* at 173 (quoting *Suez Equity,* 250 F.3d at 95) (emphasis in *Lentell* ).

26. *Lentell,* 396 F.3d at 173.

27. *Id.* at 174 (citations omitted).

28. *Id.* (quotation marks and citations omitted).

Thus, over time, the Second Circuit has advanced several different standards for pleading loss causation, including "direct causation," [29] "materialization of risk," [30] and "corrective disclosure," [31] all of which are referenced in *Lentell*. However, a close look at the recent discussion of loss causation by the Second Circuit reveals that the loss causation pleading standard, although murky, is not internally inconsistent.

Part of the problem lies in the continued expansion of the definition of "securities fraud." Some unlawful activities, such as "jaywalking," have clearly defined limits and comprise a limited range of human behavior. Securities fraud, by contrast, encompasses many distinct types of fraudulent activities, each of which causes harm in different ways. For example, a broker may "churn" a client's investments—*i.e.*, make excessive trades to generate broker commissions—and harm the client by generating large commissions.[32] A broker may assure a client that the broker will only make "safe" investments, and then spend the client's money on extremely risky securities, which lose value; in such cases, the client is harmed when the concealed risk—the volatility of the actual investments—lowers the value of her portfolio.[33] A manipulative potential partner may fraudulently persuade a sole proprietor to issue shares in a closely held company, and then dismantle the company or force out the original owner, causing the owner to lose money as the company's profits diminish.[34] A corporation with a right of first refusal on its preferred stock might assure a shareholder seeking to cash in his preferred shares that "nothing [seriously affecting share value] is going to change in the near future" when in fact the corporation knows that a recapitalization likely to enhance share prices is imminent; in such a case, the loss is caused when the

29. *See id.* at 174 ("If that relationship [between 'the plaintiff's investment loss and the information misstated'] is sufficiently direct, loss causation is established...."). *See also Suez Equity*, 250 F.3d at 98 n. 1 (construing *First Nationwide Bank v. Gelt Funding Co.*, 27 F.3d 763, 769–70 (2d Cir.1994) as "relying on 'direct causation' analysis for loss causation"). In *First Nationwide,* a RICO case involving allegations that lenders were fraudulently induced to make nonrecourse loans for the purchase of real estate, the Circuit dismissed a complaint for a number of reasons, including: (1) plaintiff had not adequately pled materiality; (2) intervening factors (including a market-wide downturn in real estate prices) likely caused plaintiff's losses; and (3) five years had elapsed between the alleged misrepresentations and the losses suffered. *See First Nationwide,* 27 F.3d at 772 (noting that "[h]ere, no social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through loan applications with a fine-tooth comb in the hope of uncovering a misrepresentation.") (quotation marks, citation and alteration omitted).

30. *See Lentell*, 396 F.3d at 173 (requiring "that the loss be caused by the materialization of the concealed risk"). *See also Suez Equity*, 250 F.3d at 98 n. 1 (calling the Seventh Circuit's "materialization of risk" standard—which involves "inquiring whether the loss at issue was caused by the materialization of a risk that was not disclosed because of the defendant's fraud"—"both principled and predictable," but noting that the Second Circuit is "not writing on a blank slate, and believe[s] that the approach here articulated best reconciles our precedents to date.").

31. *See Lentell*, 396 F.3d at 175 n. 4 (finding that, because plaintiffs alleged no corrective disclosures, they could not establish loss causation).

32. *See, e.g., Caiola v. Citibank, N.A.,* 295 F.3d 312 (2d Cir.2002).

33. *See, e.g., Louros v. Kreicas,* 367 F.Supp.2d 572, 592–93 (S.D.N.Y.2005).

34. *See, e.g., Weiss v. Wittcoff,* 966 F.2d 109 (2d Cir.1992).

employee misses out on a surge in stock prices after the recapitalization occurs.[35]

All of these examples of securities fraud cause a loss to the injured party. The mechanisms for such losses vary widely. However, the common thread is that, in each situation, "the loss be foreseeable and [ ] the loss be caused by the materialization of the concealed risk." [36] This is true even of the "somewhat inconsistent" precedents the Circuit attempted to reconcile in *Suez Equity*, which resulted in a legal standard that itself has required numerous clarifications.[37]

In *Suez Equity*, the Second Circuit offered the following as an explanation of its holding:

> The standard that we have employed in this opinion attempts to reconcile what we view as our somewhat inconsistent precedents on loss causation. *See, e.g., First Nationwide Bank v. Gelt Funding Co.*, 27 F.3d 763, 769–70 (2d Cir.1994) (recognizing "foreseeability" approach, but relying on "direct causation" analysis for loss causation); *Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992) (per curiam) (following "foreseeability" approach); *Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 22 (2d Cir.1986) (finding loss causation where "investment quality" of securities was misrepresented). Were we unconstrained by our own precedents, we might propose a different standard. We note that the approach of the Seventh

Circuit—inquiring whether the loss at issue was caused by the materialization of a risk that was not disclosed because of the defendant's fraud—appears to be both principled and predictable. *See Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685–86 (7th Cir.1990); *see also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997) ("To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries."). But, we are not writing on a blank slate, and believe that the approach here articulated best reconciles our precedents to date.[38]

Upon closer examination, however, the purportedly "inconsistent precedents" are more consistent than they might initially appear to be. That closer examination is warranted in light of the apparent confusion that reigns with respect to the element of loss causation. A chronological review may be the best approach to the required close examination.

In 1986, the Circuit decided *Manufacturers Hanover Trust*, in which the court established the "investment quality" standard for material misrepresentation cases.[39] In that case, the court held that the defendant had misrepresented the risks associated with an investment in a company whose assets were extremely unstable. Eventually, the very instability that defendant had concealed caused the collapse of the company, resulting in the

---

**35.** *Castellano*, 257 F.3d at 175.

**36.** *Lentell*, 396 F.3d at 173 (emphasis omitted).

**37.** *Suez Equity*, 250 F.3d at 98 n. 1.

**38.** *Id.* (quoting the entirety of footnote one of the *Suez Equity* opinion).

**39.** *Manufacturers Hanover Trust*, 801 F.2d at 22. *Manufacturers Hanover Trust* addressed the question of whether the district judge had

properly instructed a jury, which ultimately returned an award of $17 million, as to the legal standard for *proving*—not *pleading*—loss causation. The Circuit found that the district court, in its charge on "proximate cause," had satisfactorily instructed the jury on loss causation. Despite the different procedural posture, *Suez Equity* relied on *Manufacturers Hanover Trust*, as well as *Weiss* and *First Nationwide Bank* (both pleading cases), in formulating its pleading standard for loss causation.

loss of the investment. Thus the misrepresentation went to the investment quality of plaintiff's investment, because plaintiff "would not have contracted with [defendant] ... [to invest] had [plaintiff] known of the misrepresentation ... particularly given that the [ ] statements were in part a response to the financial community's concern regarding [defendant's] stability." [40]

In 1992, the Circuit decided the *Weiss* case, in which defendants persuaded plaintiff to sell them half his company in return for defendants' promise to provide necessary supplies.[41] But defendants did not disclose that they had no intention of keeping their promise but rather intended to take over plaintiff's business and force the plaintiff out. The court held that "it was quite foreseeable that the consummation of defendants' secret intention not to perform their promises would cause Weiss to suffer a loss." [42]

In both *Manufacturers Hanover Trust* and *Weiss*, the court held that loss causation could be pled by alleging that (1) defendants concealed a foreseeable risk associated with a securities transaction between plaintiffs and defendants; and (2) the foreseeable risk occurred causing plaintiffs' loss. The difference between the two cases is that one involved an *investor* (hence the phrase "investment quality"), and the other involved an *issuer of*

securities (hence the term "foreseeability"). But both cases involved a concealment of negative information which caused the plaintiff's loss when the concealed information eventually caused the transaction to fail.

In 1994, the Circuit decided the third loss causation case cited in *Suez Equity*, which allegedly established a "direct causation" requirement.[43] But *First Nationwide Bank* did no such thing, for the following reasons. *First*, it was not a securities case at all, but a RICO case, involving allegations that a lender was fraudulently induced to make nonrecourse loans for purchases of real estate whose value was materially misstated. The case addressed "proximate cause" rather than "loss causation," which the *Lentell* court later described as an "imperfect" analogy.[44] *Second*, the court found that several factors prevented plaintiffs from pleading proximate cause: (1) plaintiff offered no valid methodology for calculating the magnitude of the misrepresentation regarding the value of the real estate; (2) five years had elapsed between the time of the misrepresentation and the time of the loss; and (3) a massive market-wide downturn in real estate prices had occurred during the interim.[45] Nonetheless, in articulating its standard, *First Nationwide Bank* offered the following summary of the law of

40. *Id.*

41. *See Weiss*, 966 F.2d at 110–11.

42. *Id.* at 112.

43. *See First Nationwide Bank*, 27 F.3d at 755–56. Indeed, it is unclear from the text of *First Nationwide Bank* and *Suez Equity* what a "direct causation" requirement might mean in the context of securities fraud, where statements made to no investor in particular, but disseminated to the public, have consistently been found to have caused investor losses when the statements concealed a risk and the risk materialized.

44. *Lentell*, 396 F.3d at 173.

45. *See First Nationwide Bank,* 27 F.3d at 770–72. Indeed, the Second Circuit decision on which *First Nationwide Bank* relies for support of its "direct causation" requirement—*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 104 (2d Cir. 1993)—refers to the requirement that plaintiff's injuries be "directly *related*" to the alleged wrongdoing, not "directly *caused*" by it. *See Standardbred*, 985 F.2d at 104 ("These opinions emphasize the necessity of proof in a RICO case that the defendant's violations were a proximate cause of the plaintiff's injury, *i.e.*, that there was a *direct relationship* between the plaintiff's injury and the defendant's injurious conduct.") (emphasis added). The Supreme Court case on which both *Stan-*

proximate cause: "in addition to showing that but for the defendant's misrepresentations the transaction would not have come about, the [plaintiff] must show that *the misstatements were the reason the transaction turned out to be a losing one.*"[46] Although *First Nationwide Bank* is a RICO case, addressing "but-for" causation and "proximate cause," rather than the securities law concepts of transaction causation and loss causation, it articulates requirements similar to those of *Weiss* and *Manufacturers Hanover Trust.* A plaintiff must allege a material misstatement (*i.e.,* concealment of a risk), and that misstatement must be the cause of the plaintiff's loss (*i.e.,* the risk must materialize).

Thus, on closer examination, all three cases involve the concealment of a risk and the materialization of that risk. Unfortunately, however, the court in *Suez Equity* resolved the conflict in terminology by sticking with the term "investment quality." "[P]laintiffs may allege . . . loss causation by averring [ ] that . . . the defendants' misrepresentations induced a disparity between the transaction price and the true *investment quality* of the securities at the time of the transaction."[47]

In *Emergent Capital,* decided only two years later, the court essentially conceded that the legal standard stated in *Suez Equity* was incomplete. "Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement."[48] Rather, the *Emergent Capital* court noted that the *Suez Equity* plaintiffs "specifically asserted a causal connection between the concealed information—*i.e.,* the executive's [bad financial] history [and incompetence]—and the ultimate failure of the venture."[49] Thus, the *Emergent Capital* court applied the earlier standard of concealment of a risk and materialization of that risk without an explicit acknowledgment.[50]

Finally, in *Lentell,* the court paid lip service to *Suez Equity*[51] but held that the Second Circuit "require[s] both that the

dardbred* and *First Nationwide Bank* further relied, *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), is a case about indirect injury in the context of the securities laws. *Holmes* involved a multi-tiered chain of injury in a securities fraud case, in which plaintiffs alleged that an individual's manipulation of securities caused securities prices to crash, thereby causing injury to two broker-dealers. Those broker-dealers, in turn, were subsequently unable to fulfill their own obligations to plaintiffs. *Holmes* is a classic proximate cause decision in which the chain of causation is too diffuse to fairly hold a defendant liable for a twice-removed plaintiff's injuries. It does not articulate a standard of loss causation stricter than the Second Circuit's traditional standard.

**46.** *First Nationwide Bank,* 27 F.3d at 769 (emphasis added).

**47.** *Suez Equity,* 250 F.3d at 97–98 (quotation marks omitted).

**48.** *Emergent Capital,* 343 F.3d at 198.

**49.** *Id.*

**50.** Indeed, even if *Emergent Capital* had explicitly reaffirmed the standard of *Suez Equity,* which calls only for a disparity between price and investment quality at the time of purchase—*i.e.,* artificial inflation—the standard would no longer be valid. In *Dura,* 125 S.Ct. at 1630, the Supreme Court overturned the Ninth Circuit's permissive standard for pleading loss causation, which required only that a plaintiff allege that a security's value was artificially inflated at the time of purchase.

**51.** *See Lentell,* 396 F.3d at 174 ("We follow the holding[ ] of . . . *Suez Equity.*"); *but see id.* at 173 ("We acknowledge that the pleading principles set out in the foregoing passage require both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk; and we further acknowledge that our opinion in *Suez Equity* can be (mis-)read to say that this Circuit has

loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." [52] It is thus beyond cavil that *Lentell* requires more than the bare "proximate cause" standard asserted by plaintiffs here.[53]

## B. Application to *Liu v. CSFB*

It is vital to understand the nature of the risks that plaintiffs in the instant action allege were concealed. There are two kinds of risk. One risk is that the market could simply discover that the earnings estimates had been tainted by fraud, and that confidence in the securities would diminish, causing their prices to fall. The other risk is more central to plaintiffs' alleged scheme. Plaintiffs have alleged that defendants' scheme lowballed earnings estimates, warned the public that those estimates might be too low, and then reported earnings that exceeded those estimates. As a result, defendants induced the public to overvalue the securities. But when the investors eventually learned that the earnings did not always exceed expectations, their confidence collapsed, as did the price of the stock, causing their loss.

## 1. Disclosure of Falsity

■ The first type of "concealed risk" at issue here—*i.e.*, that the public might learn that the earnings estimates were fraudulent when made—*could* support a claim for securities fraud if plaintiffs had pled a disclosing event. *Lentell* teaches, however, that such a concealment can only cause losses after it is disclosed:

> plaintiffs have argued (affirmatively) on this appeal that the falsity of Merrill's recommendations was made public no earlier than April 2002, when the NYAG's affidavit "described the inner workings of Merrill's Internet Group," and that until then plaintiffs (and presumably the market at large) therefore lacked knowledge of the fraud. The complaints withstand the statute of limitations on the strength of that argument. By the same token, however, Merrill's concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public.[54]

The reasoning is simple. Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss.[55] By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed— *i.e.* a corrective disclosure.[56]

rejected the 'materialization of risk' approach. *Suez Equity* does not purport to express this Circuit's authoritative position, because that wording: (i) is dicta consigned to a footnote; (ii) is framed in terms that are tentative and speculative, *see* [*Suez Equity*, 250 F.3d] at 98 n. 1 ('The standard that we have employed in this opinion *attempts* to reconcile *what we view* as our *somewhat* inconsistent precedents on loss causation.') (emphasis added); and (iii) is expressly limited to what was (in 2001) 'our precedents *to date*,' *id.* (emphasis added)." ) (emphasis and parentheticals in original).

52. *Id.* (beginning of second full paragraph; beginning of third full paragraph) (emphasis

in original). Curiously, the exact same language, including the emphasis, appears twice on the same page of the *Lentell* decision.

53. 2d Reconsideration Mem. at 3.

54. *Lentell*, 396 F.3d at 175 n. 4.

55. *See, e.g., Suez Equity* (concealed incompetence led to company's collapse); *Castellano*, 257 F.3d at 187 (concealed intent to recapitalize led plaintiff to sell stock in ignorance of the fact that company would recapitalize thereby vastly increasing stock value).

56. *See Lentell*, 396 F.3d at 173 ("the misstatement or omission [involving favorable analyst

Plaintiffs have not alleged that defendants' fraudulent concealment of their true opinions was ever disclosed, and plaintiffs have made no attempt to tie such a disclosure to their alleged losses. Under *Lentell*, plaintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses.[57]

The circumstances of *Lentell* are strikingly similar to those alleged in the instant case. In both cases, plaintiffs argued that the fraud was not disclosed, if ever, until years *after* their losses were realized, in successful efforts to withstand dismissal based on the statute of limitations.[58] Both cases allege that plaintiffs' losses were caused when negative market events (*i.e.*, a downgrading of "buy" recommendations or a failure to meet earnings forecasts) were followed by a decline in securities

prices. In *Lentell*, though, the court held that the fraudulent nature of the analysts' conduct was not revealed until "the inner workings of the [analyst] Group" were disclosed; the downgrading of "buy" recommendations did not disclose that the analysts' reports had been tainted.[59] In this case, the gulf between what was alleged to have been the concealed risk and the events that materialized is even more apparent: what was concealed was the analysts' belief that revenue *would* exceed forecasts, and what materialized was exactly the opposite. Accordingly, plaintiffs have *never* alleged any disclosure of the falsity of defendants' opinions.

### 2. The Market Conditioning Theory

■ With respect to the other allegedly concealed risk—that a complicated scheme misled the public as to the true value of

---

recommendations] concealed something from the market that, when disclosed, negatively affected the value of the security."); *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 375314, at *6 ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.").

57. *See id.* at 175 n. 4.

58. Specifically, the concealment in *Lentell* was alleged to have been disclosed when the New York Attorney General's office issued an affidavit describing the analysts' behavior. *See id.* In the instant case, no such disclosure has been alleged.

59. *Id.* In *Lentell*, the "inner workings" of the analysts' group showed that the analysts ignored warnings that certain companies might fail. However, the analysts never lied about those specific defects; rather, their alleged fraud was to be unfailingly upbeat and to inflate share prices through repetitive positive reviews of the securities at issue. *See id.* at 165–66 (summarizing the alleged fraud, which involved "bullish research reports," publication of "BUY or ACCUMULATE" recommendations, and "profoundly unrealistic price targets," issued pursuant to agreements to pump up share prices and share in the

investment banking proceeds). Thus, what the analysts concealed was that they did not believe in their own statements, and the effect of their false praise dissipated only when their alleged fraud came to light. *Compare id. with Fogarazzo v. Lehman Bros et al.*, No. 03 Civ. 5194 (Order of 2/10/05), in which I noted that plaintiffs had made the following allegations regarding concealment of specific investment risks:

> On September 7, 1999 . . . Lehman analysts resumed [Lehman's] 1–Buy rating and evaluated RSL's break-up value as exceeding $40 per share. Additionally, [an] analyst cited RSL's Delta 3 IPO as "pure upside to our valuation" of RSL. Documents reveal that RSL . . . in fact, thought little about Delta 3's long-term prospects.
>
> . . .
>
> Morgan Stanley . . . reiterated its Strong Buy rating and a $38.00 per share price target for RSL, even though . . . RSL announced [three days earlier] that it had taken a massive $32 million restructuring charge. Incredibly, in the same [ ] report, Morgan Stanley characterized the $32 million charge to earnings as "a positive for RSL."

2/10/05 Order in *Fogarazzo*, No. 03 Civ. 5194, at 3–4.

the stock—the loss can only be caused when the true value of the securities is revealed to the public. This theory depends on the supposition that the investing public would disregard the available objective evidence of a company's performance (*e.g.*, its past verified earnings statements, its stature in the marketplace, and its posture in mergers and acquisitions) and instead overvalue the company by relying on the fraudulently nurtured belief that the company would continue to exceed earnings estimates indefinitely.

*Lentell* acknowledges that "systematically overly optimistic" analysts' reports (and, by analogy, the systematically pessimistic earnings forecasts alleged here), might sometimes support a claim of securities fraud.[60] However, "where [ ] substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk," *Lentell* imposes a heavy burden on plaintiffs to plead their losses specifically.[61] As in *Lentell*, the hundreds of statements that accompanied defendants' earnings forecasts warned that defendants' estimates were unreliable and could be beaten.[62] In such cases, "a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud— rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and undisclosed portions of the risk that ultimately destroyed an investment."[63]

Plaintiffs have failed to allege facts sufficient to do either. Rather, they have alleged that the concealed risks materialized when one of three "Disclosing Events" occurred: (1) reported revenue failed to meet or exceed earnings forecasts; (2) a company announced such a shortfall before reporting revenues; or (3) analysts revised their estimates downward.[64] As I noted in my June 8, 2004 Opinion granting plaintiffs' motion for leave to amend their complaint, "each Disclosing Event was the unfortunate but commonplace event of a publicly traded company failing to meet its revenue forecast, coupled with a concomitant and predictable immediate drop in share prices."[65] Plaintiffs have made no effort to allege that it was the defendants' fraud that caused their losses. Nor have plaintiffs alleged "facts sufficient to apportion the losses" between that predictable immediate drop in share prices and any loss that might be attributable to investors abandoning their belief that earnings would exceed estimates forever.[66]

---

**60.** *Lentell*, 396 F.3d at 177.

**61.** *Id. Lentell* refers to the fact that the allegedly fraudulent analysts' recommendations in that case (*i.e.*, "buy" or "accumulate") were invariably accompanied by cautionary language that the stock prices were volatile. In fact, the securities at issue in *Lentell* were rated in the "most risky" possible category on a four-point scale. Plaintiffs in *Lentell* alleged that defendants' analyst reports concealed the risk of volatility in share prices—*i.e.*, the chance that the prices could plummet despite earlier "buy" recommendations. Thus, the "substantial indicia of the risk" were the warnings that the stock price was volatile, and they appeared "on the face" of the analyst reports. Put another way, *Lentell* establishes a standard for those situations in which allegedly misleading statements include cautionary language that the statements might be wrong or misleading. In such cases, plaintiffs must meet a heavy burden of alleging specific losses that are connected to the risks that were actually *concealed*, rather than those risks that were *disclosed* by defendants in their cautionary statements. *See id.*

**62.** *See* Exs. D, E to Third Amended Complaint.

**63.** *Lentell*, 396 F.3d at 177.

**64.** Third Amended Complaint ¶ 225.

**65.** *In re IPO ("Liu I")*, 341 F.Supp.2d 328, 350 (S.D.N.Y.2004).

**66.** *Lentell*, 396 F.3d at 177.

Accordingly, plaintiffs have failed to allege loss causation.

## V. CONCLUSION

For the foregoing reasons, plaintiffs' second motion for reconsideration is denied in its entirety. The Clerk is directed to close this motion and this case.

SO ORDERED: