**EMERGENT CAPITAL INVESTMENT MANAGEMENT, LLC., Plaintiff–Appellant,**

**v.**

**STONEPATH GROUP, INC., previously known as Net Value Holdings, Inc., Andrew Panzo and Lee Hansen, Defendants–Appellees.**

**Docket No. 02–7503.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 2002.

Decided Sept. 4, 2003.

---

Martin Stein, New York, New York (Heller, Horowitz & Feit, P.C., New York, New York, of counsel), for Plaintiff–Appellant.

Richard M. Beck, Philadelphia, Pennsylvania (Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Philadelphia, Pennsylvania; John C. Canoni, Kasowitz, Benson, Torres & Friedman LLP, New York, New York, of counsel), for Defendants–Appellees.

Before: VAN GRAAFEILAND, CARDAMONE, and JACOBS, Circuit Judges.

CARDAMONE, Circuit Judge.

This is a securities fraud action. It arises out of a failed investment by plaintiff Emergent Capital Investment Management, LLC (Emergent, plaintiff, or appellant), in the preferred stock of defendant Net Value Holdings, Inc., presently known as Stonepath Group, Inc. (NETV). Plaintiff alleges that during the negotiations leading up to its investment in defendant, NETV's officers, defendants Andrew Panzo and Lee Hansen, repeatedly misrepresented the size of NETV's largest asset, its investment in a company called Brightstreet.com, Inc. (Brightstreet). Emergent further asserts that defendants unlawfully failed to disclose defendant Panzo's history of failed investment projects undertaken in collaboration with one Howard Appel, an individual barred from the securities industry by the National Association of Securities Dealers (NASD). It is plaintiff's contention that Appel effectively controlled defendant through affiliated individuals and entities, a fact defendants should have but failed to disclose to Emergent. Read in the light most favorable to Emergent, the complaint suggests that Panzo, Appel and their affiliated entities artificially inflated the stock prices of the companies controlled by Appel, including NETV, sold their own stock in those companies at high profits, and thereafter allowed the stock prices to plummet, rendering worthless other shareholders' investments.

Plaintiff sued defendants in the United States District Court for the Southern District of New York before Judge Robert W.

Sweet. Defendants' motion to dismiss plaintiff's second amended complaint under Fed.R.Civ.P. 12(b)(6) was granted in a judgment entered April 22, 2002. The district court ruled that the content of the stock purchase agreement between the parties precluded plaintiff from establishing reasonable reliance on the alleged misrepresentations and omissions. It did find, however, that plaintiff's allegations of loss causation were sufficient.

To the extent that plaintiff's claims are premised on defendants' representations regarding the Brightstreet investment, we agree that it cannot establish reasonable reliance. Plaintiff's failure to insist that these representations be reflected in the written stock purchase agreement leads us to conclude that a sophisticated investor like Emergent could not have reasonably relied on them. Hence, that dismissal must be affirmed.

We find no similar defect in plaintiff's claims premised on alleged omissions regarding Panzo's investment history and Appel's control of NETV. We think that the second amended complaint contains legally sufficient allegations of a causal connection between the subject matter of these omissions and the ultimate decline in NETV's stock value, that is, loss causation. Accordingly, we vacate the dismissal of these claims.

## BACKGROUND

### A. *Parties*

Plaintiff Emergent, a Delaware limited liability company with its principal office in New York City, manages an investment fund. Its two managing members, Daniel Yun and Mark Waldron, own 90 percent of its stock. Both had previously worked in prominent Wall Street firms, and both have substantial business and investment experience. At the time of the events giving rise to this litigation, Emergent managed between $5 and $7 million in investments.

Defendant NETV, a Delaware corporation with its principal place of business in California, is a holding company specializing in Internet-based businesses. Defendant Andrew Panzo is the chairman of its board of directors and is its chief executive officer (CEO), and defendant Lee Hansen is its director and president. Hansen is also a former roommate and personal friend of Emergent's managing member Mark Waldron.

### B. *Factual Allegations of the Second Amended Complaint*

The following facts are alleged in plaintiff's second amended complaint and must be accepted as true for purposes of reviewing a complaint dismissed under Rule 12(b)(6).

### 1. *NETV's Solicitation of Emergent's Investment and the Resulting Stock Purchase*

In January 2000 NETV began soliciting investors for a private placement of its securities. As part of this solicitation effort, NETV's president Hansen approached his former roommate and plaintiff's managing member, Mark Waldron, and arranged for a meeting in New York between the principals of the two companies. On January 20, Hansen and NETV's CEO Panzo met with Waldron and Yun.

During their presentation on the benefits of investing in NETV's preferred stock, Panzo and Hansen told Waldron and Yun that NETV had invested approximately $17 million in seven e-commerce companies, and that the largest of those investments was a $14 million purchase of a 12 percent equity interest in Brightstreet. The two NETV executives also gave Waldron and Yun a brochure detail-

ing information regarding their company, which repeated their oral representations with respect to the size of the Brightstreet investment.

As a result of defendants' solicitation, plaintiff in March 2000 purchased 166,667 shares of NETV's preferred stock at $12 per share, making a total investment of $2 million. In the stock purchase agreement executed by the parties, NETV made extensive warranties and representations regarding its capital structure, indebtedness, involvement in litigation, ownership and leases of real and personal property, and other matters connected with its business. The stock purchase agreement, in addition, contained a standard merger clause, stating that the agreement, together with accompanying documents, "contain[ed] the entire understanding and agreement among the parties . . . and supersede[d] any prior understandings or agreements between or among any of them."

Prior to Emergent's purchase of NETV stock, the size of the Brightstreet investment had not been publicly disclosed in NETV's regulatory filings. Two months later, in May 2000, NETV filed its 1999 Form 10–K with the Securities and Exchange Commission, disclosing that its investment in Brightstreet amounted to $4 million, not the $14 million that it had represented to plaintiff.

### 2. *Panzo and Appel's Investment History and Appel's Ties to NETV*

Neither in negotiations leading up to plaintiff's investment in NETV nor in the stock purchase agreement itself did defendants mention any connection between NETV and Howard Appel, who since 1991 had been barred by the NASD for life from associating with any member of that organization in any capacity. Disbarment of Appel for life came about, in part, be-

cause of his sale of unregistered securities to customers. Plaintiff later learned that defendant's CEO Panzo had had a long history of collaborating with Appel in various investment schemes. Further, through a series of affiliated entities and individuals Appel played a significant role in NETV's founding, financing and particularly, in its control.

Panzo's business relationship with Appel began in 1992–1993, when Panzo worked as an executive vice president in an investment bank owned and controlled by Appel. After leaving the bank, Panzo collaborated with Appel on a number of investment projects, and their collaboration followed the same general pattern. Appel, through an affiliated company, would acquire control of a public shell corporation and exercise that control to install Panzo as a director or a senior officer, because Appel himself, on account of his past record, could not be a director of a public company. With Panzo in a top management position, the company would transfer substantial quantities of stock or warrants to Appel and Panzo's affiliates, either in a sale transaction, or in payment for purported consulting or investment banking services, or as a finder's fee in anticipation of a merger. Then the two men—through extraordinarily complex corporate legal maneuvers, often by way of subsidiaries of the companies of which they were principals, such as reverse mergers, stock exchanges between public and private corporations, reverse stock splits, a bewildering list of corporate name changes, and other corporate devices—would end up with large amounts of stock or warrants to purchase stock. Appel affiliates would then sell the securities at a relatively high price, generating large profits for Appel and Panzo. Subsequently, these companies' stock became virtually worthless.

NETV itself was similarly created through a merger of a public shell corporation with a private company largely owned by persons who were affiliated with Appel, and who also had participated as shareholders in eight other Panzo–Appel ventures. After the merger, these persons became NETV shareholders, and additional quantities of NETV stock were first transferred to and later sold by another Appel affiliate.

## C. *Procedural History*

Between January and March 2000, when Emergent negotiated with and invested in NETV, the price of NETV's common stock generally remained between $10 and $30 per share. That price later fell to below $1 per share. In the summer of 2000, as the NETV stock price was declining, Emergent demanded rescission of the stock purchase agreement. Once this demand had been rejected, it commenced in October 2000 its first civil action against defendants. The complaint alleged primarily that defendants had misrepresented the overall size of the stock offering in which plaintiff had participated. Defendants answered the complaint, and, after some discovery, moved for a summary judgment.

On May 9, 2001, during the briefing of the summary judgment motion in the first action, plaintiff commenced a second action against defendants, alleging the same misrepresentations about the Brightstreet investment that are at issue in this appeal. Shortly thereafter, plaintiff filed its first amended complaint in the second action, alleging additionally failure to disclose Appel and Panzo's shared investment history and NETV's ties to Appel. Defendants moved to dismiss the first amended complaint under Fed.R.Civ.P. 12(b)(6), and Emergent moved to consolidate the two actions.

In October 2001 the district court granted defendants' motions for summary judgment in the first action and for a dismissal of the first amended complaint in the second action. See *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F.Supp.2d 615, 618 (S.D.N.Y.2001). In the first action, the court dismissed claims of misrepresentations about the size of the offering because Emergent could not demonstrate either reasonable reliance or loss causation. *Id.* at 621–25. In the second action, the court also found no adequate allegation of loss causation and, with respect to alleged misrepresentations about the Brightstreet investment, no reasonable reliance. *Id.* at 625–27. The two actions were consolidated and Emergent was granted leave to replead its first amended complaint. *Id.* at 627.

Emergent then filed the second amended complaint, which is the subject of this appeal and the factual allegations of which are described above. Defendants again moved to dismiss on the grounds of reasonable reliance and loss causation, and the district court again granted their motion. Although the trial court now concluded that Emergent had adequately alleged loss causation, it found the allegations of reasonable reliance insufficient and dismissed Emergent's claims without leave to replead. This appeal followed.

## STANDARD OF REVIEW

We review *de novo* a district court's dismissal of a complaint for failure to state a cause of action. See *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 321 (2d Cir.2002). Dismissal is proper if, accepting all the allegations in the complaint as true and drawing all reasonable inferences in plaintiff's favor, the complaint fails to allege any set of facts that would entitle plaintiff to relief. *Id.*

## DISCUSSION

### I Reasonable Reliance

In the second amended complaint, appellant asserts three causes of action: (1) a violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5; (2) controlling person liability under § 20 of the Securities Exchange Act against defendants Hansen and Panzo, *see* 15 U.S.C. § 78t; and (3) common law fraud. Both parties' reliance on New York authorities indicates their agreement that the common law fraud cause of action should be decided under the law of New York, where the alleged misrepresentations occurred.

■ For plaintiff to prevail on any one of its three theories for recovery, it has to establish reasonable reliance on the alleged misrepresentations · or omissions. *See Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996); *see also* 15 U.S.C. § 78t(a) (providing for·controlling person's liability for controlled person's violations of federal securities laws). In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541–43 (2d Cir.1997); *Harsco*, 91 F.3d at 345–46.

For example, in *Harsco*, a buyer and a seller of a company executed a written agreement stating that—as to certain aspects of the sold company's operations—the seller was not making any representations beyond those listed in the agreement. 91 F.3d at 345. Some of the alleged extra-contractual misrepresentations, however, pertained to the very aspects of the operations that were covered by that disclaimer.

*Id.* at 345–46, 347, 348. Based on the disclaimer's content as well as on the sophistication of the parties to the transaction, we rejected the buyer's federal securities and common law fraud claims for lack of reasonable reliance. *Id.*

Even more instructive is *Lazard Freres.* That case involved an attempted sale of several million dollars worth of bank debt between two large and sophisticated bank debt traders. 108 F.3d at 1533. During negotiations, the seller's representative made false statements with respect to the content of a certain report on the debtor's financial condition. 108 F.3d at 1534, 1543. In the time-sensitive context of the negotiations, the buyer had to make an oral commitment to the purchase before it had an opportunity to review the report. *Id.* Assessing the reasonableness of the buyer's reliance on the seller's representations regarding the report's content, we reasoned that, as a sophisticated participant in the bank debt market, the buyer should have, and easily could have, protected itself from misrepresentation by demanding that it see the report prior to a closing. As the New York Appellate Division explained in similar circumstances

> where ... a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or *inserting appropriate language in the agreement for· his protection,* he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.

*Rodas v. Manitaras*, 159 A.D.2d 341, 343, 552 N.Y.S.2d 618 (1st Dep't 1990) (emphasis added). After quoting that language

from the state court's opinion, *Lazard Freres* went on to hold that unless the oral purchase agreement allowed the buyer to withdraw from the transaction on discovering inaccuracies in the seller's representations, the buyer's failure to insist that the oral agreement grant it an "out" under such circumstances rendered reliance on the seller's representations unreasonable as a matter of law. *Lazard Freres,* 108 F.3d at 1543.

Here, as in *Lazard Freres,* plaintiff was a sophisticated investor. Indeed, in the stock purchase agreement Emergent represented that it had "knowledge and experience in financial and business matters" and that it could readily evaluate the risks of the transaction. Further, it secured from defendants extensive contractual representations concerning NETV's financial condition and operations.

█ Consequently, having been told that NETV's largest investment was its $14 million purchase of an equity interest in Brightstreet, Emergent should have protected itself by insisting that this representation be included in the stock purchase agreement. Given NETV's extensive contractual representations about other matters, appellant's sophistication, and the size of the transaction, Emergent's failure to do so precludes as a matter of law a finding of reasonable reliance upon defendants' misrepresentations about Brightstreet.

Appellant's attempts to distinguish this case from *Lazard Freres* are unpersuasive. Given the sophistication of this financial transaction and of the parties, and absent any allegation of a fiduciary relationship, the personal friendship between Waldron and Hansen does not make appellant's reliance on the alleged extra-contractual representations reasonable. In addition, although in *Lazard Freres* we were reviewing a grant of summary judg-

ment rather than a dismissal at the pleadings stage, this distinction is without a difference in the case at hand, as our ruling is based solely on the allegations contained in the second amended complaint and the language of the stock purchase agreement. Nor is our conclusion undermined by the fact that the alleged misrepresentations were made both orally and in writing, and not solely orally as in *Lazard Freres.* To the contrary, the written reference to Brightstreet in NETV's brochure should have served as additional notice to appellant that this allegedly significant representation should be reflected in the contract. Accordingly, the district court's dismissal of claims based on misrepresentations about the Brightstreet investment must be affirmed.

## II  Loss Causation

We turn now to loss causation. As defendants concede, the recited reasoning with respect to reasonable reliance does not preclude the claims premised on Panzo's investment history and NETV's ties to Appel. Because these causes of action are based on omissions rather than affirmative misstatements, Emergent had no notice of the omitted facts and could not have protected itself by insisting on corresponding contractual representations. Thus, as to these claims, we examine the second amended complaint to ascertain whether it contains legally sufficient allegations of causation.

### A.  *Governing Standards*

█ To prevail on its federal securities fraud claims, appellant must demonstrate that its injuries were caused by defendants' omission of material information. *See Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 179 (2d Cir.2001); *see also* 15 U.S.C. § 78t(a) (providing for controlling person's liability for controlled person's violations of federal securities laws). The causation element has two as-

pects, both which must be alleged and proven: transaction causation and loss causation. *See Castellano,* 257 F.3d at 186. Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. *See id.* It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction. *Id.; Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 96 (2d Cir.2001).

■ Loss causation, by contrast, is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff. *See Suez Equity,* 250 F.3d at 96. We have often compared loss causation to the tort law concept of proximate cause, "meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Castellano,* 257 F.3d at 186; *see also Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992) (comparing loss causation to proximate cause).

Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of NETV securities. *See Citibank,* 968 F.2d at 1496–97. Of course, if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.

**B.** *Causation Allegations in the Second Amended Complaint*

■ Defendants do not contest the sufficiency of Emergent's transaction causa-

tion allegations. Appellant has indeed alleged that it would not have purchased the NETV stock had it known about Panzo's investment history and NETV's connection to Appel. The sufficiency of Emergent's loss causation allegations, by contrast, is hotly disputed on appeal. Although the question is a close one, we think that, read in the light most favorable to plaintiff, the second amended complaint does allege the required connection between plaintiff's economic loss and defendants' alleged omissions detailed earlier.

Plaintiff asserts that "[p]laintiff's loss was a foreseeable consequence of defendants' omissions particularly *in light of the drastic price declines which occurred in the shares of the other companies*" controlled by Panzo and Appel. *See* 2d Am. Compl. ¶ 79(ii) (emphasis added). Interpreted most favorably to Emergent, this statement suggests that the decline in NETV's stock value was brought about by the same forces that caused the failures of the other Panzo–Appel ventures. Moreover, plaintiff has declared that the other Panzo–Appel ventures described in the complaint were "pump and dump" schemes. *Id.* at ¶ 70. From these two statements we infer that Emergent alleges that NETV itself was a "pump and dump" scheme—that is, a scheme where the company principals artificially inflated NETV stock prices before "dumping" their own shares of NETV stock on the market. *See* 3 Thomas Lee Hazen, *The Law of Securities Regulation* § 14.18 (4th ed.2002) (describing "pump and dump" schemes). This allegation of loss causation is reinforced by plaintiff's assertions that Appel, Panzo, and their affiliates had "the ability to manipulate stock prices" of their ventures and that Appel's affiliated entities sold substantial quantities of NETV stock during 2000 and 2001. *See* 2d Am. Compl. ¶¶ 59–60, 70.

Because the second amended complaint may be read as alleging that NETV was a "pump and dump" scheme, appellant has adequately alleged loss causation for the purposes of its federal securities fraud claims. For the same reason, it has also adequately alleged proximate causation for the purposes of its common law fraud claim.

### III  *Suez Equity* Clarified

■ Appellant declares that, regardless of its "pump and dump" allegations, the second amended complaint states an independently sufficient theory of loss causation. It asserts that defendants' omissions about Appel and Panzo "induced a disparity between the price plaintiff paid for the NETV shares and their true investment quality" at the time of the purchase.2d Am. Compl. ¶ 79(ii). The district court accepted this argument, relying, as does Emergent, on our decision in *Suez Equity*.

Such view misperceives that holding. Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement. By claiming that it incorrectly appraised the value of NETV securities and purchased them at an inflated price, Emergent simply asserts that, had it known about Panzo's investment history and about NETV's ties to Appel, it would not have agreed to buy NETV's stock at the offering price. Hence, its "investment quality" allegation amounts to nothing more than a paraphrased allegation of transaction causation. While it may explain why plaintiff purchased the NETV's stock, it does not explain why it lost money on the purchase, the very question that the loss causation allegation must answer.

In its misplaced reliance on *Suez Equity*, appellant overlooks a crucial aspect of that decision. There, defendants, in soliciting plaintiffs' investment in a company, gave plaintiffs an edited version of a background report on one of the company's principal executives. 250 F.3d at 93–94. The edited version omitted important negative events in the executive's financial and business history, such as multiple tax liens, delinquent credit accounts, an involuntary bankruptcy proceeding, and pending civil lawsuits. *Id.* at 94. Plaintiffs claimed that the concealed events reflected the executive's inability to manage debt and maintain adequate liquidity. *Id.* Plaintiffs also alleged that their investment ultimately became worthless because of the company's liquidity crisis and expressly attributed that crisis to the executive's inability to manage the company's finances. *Id.*

Thus, the *Suez Equity* plaintiffs did not merely allege a disparity between the price they had paid for the company's securities and the securities' "true" value at the time of the purchase. Rather, they specifically asserted a causal connection between the concealed information—*i.e.,* the executive's history—and the ultimate failure of the venture.

Appellant points out that in *Suez Equity* we referred to a "disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction" and that we also observed that the *Suez Equity* plaintiffs had "suffered a loss at the time of purchase since the value of the securities was less than that represented by defendants." *Id.* at 98. As is evident from the discussion above, however, Emergent's argument takes these references out of context. We did not mean to suggest in *Suez Equity* that a purchase-time loss allegation *alone* could satisfy the loss causation pleading requirement. To the contrary, we emphasized that the plaintiffs had "also adequately alleged a second, related, loss— that [the executive's] concealed lack of managerial ability induced [the company's] failure." *Id.* Moreover, we expressly dis-

tinguished that case from one where the ultimate decline in the market price of a company's securities would be unrelated to that company's manager's concealed negative history. *Id.* at 98–99.

Disagreeing with appellant's contentions, therefore, we do not think *Suez Equity* undermined our established requirement that securities fraud plaintiffs demonstrate a causal connection between the content of the alleged misstatements or omissions and "the harm actually suffered." *Id.* at 96; *see also Castellano,* 257 F.3d at 189 (finding sufficient evidence of loss causation where a jury could find that defendants failed to disclose to plaintiff "the very risk to which [plaintiff] fell victim").

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed, in part, and vacated, in part, and the case is remanded to the district court for further proceedings consistent with this opinion.