Mei Ping (Barbara) MATSUMURA and Carl Milner, as Trustee of the Trust u/w/o Arthur Cutler, individually and as shareholders of Haru Holding Corp., Plaintiffs,

v.

BENIHANA NATIONAL CORPORATION, Haru Holding Corp., and Darwin Dornbush, Defendants.

No. 06 Civ. 7609(NRB).

United States District Court, S.D. New York.

Jan. 25, 2008.

Alfred N. Metz, Esq., Deutsch, Coffey & Metz, LLP, New York, NY, for Plaintiffs Mei Ping (Barbara) Matsumura and Carl Milner, as Trustee of the Trust u/w/o Arthur Cutler.

Alan H. Fein, Esq., Adam M. Schachter, Esq., Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, FL, Lewis R. Clayton, Esq., Amir Weinberg, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendants Benihan National Corporation and Haru Holding Corporation.

Jonathan J. Lerner, Esq., Maura Barry Grinalds, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, for Defendant Darwin Dornbush.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

This opinion addresses Darwin Dornbush's ("Dornbush") motion to dismiss the amended complaint pursuant to Fed. R.Civ.P. 12(b)(6). The plaintiffs Mei Ping (Barbara) Matsumura ("Matsumura") and Carl Milner ("Milner" and collectively "plaintiffs") filed the instant suit against Darwin Dornbush alleging breach of fiduciary duty, fraud in the inducement, constructive fraud, negligent misrepresentation, and aiding and abetting breach of fiduciary duty. Their claims arise from alleged representations made by Dornbush, while serving as legal counsel for Benihana National Corporation ("Benihana"), regarding Benihana's prospective performance under a stock purchase agreement that governed the plaintiffs' sale of a controlling interest in Haru Holding Corp. ("Haru Holding") to Benihana.[1] For the reasons stated herein, Dornbush's motion is granted.

## BACKGROUND[2]

The background of the business transaction that is the genesis of this lawsuit may be summarized as follows.

---

1. At oral argument on the motions to dismiss the amended complaint, the Court sustained the breach of fiduciary duty and breach of contract claims against Benihana and dismissed the remaining claims against defendants Benihana and Haru.

2. In considering a 12(b)(6) motion to dismiss, this Court must accept as true the facts alleged in the amended complaint, *Bolt Elec.,* *Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995), drawing all reasonable inferences in favor of the plaintiffs. *See Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004). For purposes of dismissal, the amended complaint "is deemed to include any document" that is fairly "integral" to the allegations. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002).

*Dornbush Introduces the Plaintiffs to Benihana*

The plaintiffs are restaurateurs who owned and operated Haru, a New York City sushi restaurant chain. (Am. Compl.¶¶ 9–10). While Dornbush served as Benihana's general counsel, corporate secretary, and a member of its board of directors, he was also the plaintiffs' attorney for a variety of Haru-related matters. (Am.Compl.¶¶ 10–14). In early 1999, Benihana indicated an interest in acquiring the Haru franchise from the plaintiffs and Dornbush arranged several preliminary discussions between the parties to explore the possibility of a purchase. (Am. Compl.¶ 16). Notably, neither Benihana nor the plaintiffs retained independent counsel for the purpose of deciding whether the transaction was viable. (Am. Compl.¶ 19). The parties reached an agreement in principle in July, 1999: Benihana would acquire a majority, controlling interest in Haru but also grant the plaintiffs a put option requiring Benihana to purchase their remaining shares at some future time. (Am.Compl.¶¶ 16, 29).

The plaintiffs allege that Dornbush made several statements during this introductory period that are actionable:

On or about May 26, 1999, Dornbush transmitted a term sheet directly to Matsumura, ... and Carl Milner, "outlin[ing] the principal business terms of the transaction for sale of 80% of Haru to Benihana, Inc.". Item 3 of the term sheet, entitled "No Liabilities", specified that "except for trade debt, none of the corporations shall have any debt; and there should be sufficient cash-on-hand to pay the trade debt."

\* \* \* \* \* \*

In or about July and August 1999, BNC and Dornbush represented to Plaintiffs, that the mechanism for pricing the Put Option would provide them with the fair market value of their stock in Haru.

\* \* \* \* \* \*

Commencing in or about July 1999 and on numerous occasions thereafter, ... Dornbush further represented to Plaintiffs that by retaining 20% of Haru with a "Put Option" to sell at a later date, Plaintiffs would reap the benefits of the opening of new Haru restaurants which would be funded by BNC.

(Am.Compl.¶ 17, 29, 30)

*The Parties Draft The Purchase Agreement*

Once the parties had reached a tentative understanding of the basic terms of the transaction, Dornbush suggested that the plaintiffs obtain independent representation before any documents were drafted. (Am.Compl.¶¶ 6, 19). The plaintiffs hired Michael Paikin ("Paikin") to represent them and Dornbush served as legal counsel for Benihana. (Am. Compl. ¶¶ 6, 19; Pl. Opp. at 43 n. 14). Nevertheless, the plaintiffs saw Paikin's retention as "a mere formality" and, according to the complaint, persisted in the belief that Dornbush would represent their interests in structuring the transaction.[3] (Am.Compl.¶ 20).

One of the negotiated terms of sale was the valuation of plaintiffs' shares covered by the put option. Initially, the parties contemplated that the exercise (or put) price would be the "fair market value" of the plaintiffs' shares. (Am.Compl.¶ 28). By November, 1999, the put price had been defined with much greater precision through a pricing formula that accounted for Haru Holding's consolidated cash flow and total outstanding debt. (Am.

---

**3.** While negotiations with Benihana were still ongoing, Dornbush continued to represent the plaintiffs in connection with ancillary matters pertaining to Haru and their other restaurants. (Am.Compl.¶ 12, 13, 19, 21, 33).

Compl.¶ 37, 42). This definition was eventually incorporated into the parties' interim drafts and the Stockholders' Agreement memorializing the sale. (Am.Compl.¶ 37–41).

The plaintiffs insist that two of Dornbush's representations over the course of drafting and negotiating the Stockholders' Agreement were misleading:

> In or about late October or early November 1999, Dornbush orally represented to Carl Milner that the prior definition of the Put Price as based on fair market value was too "nebulous", and that the change in language was intended simply as a "clarification" so that there was no ambiguity going forward. Based upon Dornbush's representation and omission of any contrary information, Plaintiffs understood and believed that the change in language did not and would not materially adversely affect the value of the Put Price.

> \* \* \* \* \* \*

> In or about October and early November 1999, Dornbush represented to at least Milner that, in consideration of the relatively low salary Matsumura would be receiving, the Put Option was structured to provide her with a fair value of her stock based upon the performance of Haru, independent of the costs of acquisition and expansion.

(Am.Compl.¶ 42, 43).

*The Stockholders' Agreement and Matsumura's Employment*

On December 6, 1999, the parties executed the Stockholders' Agreement, pursuant to which Benihana acquired an eighty percent stake in the defendant-entity Haru Holding Corp. ("Haru Holding") for a cash purchase price of $8,125 million, and the plaintiffs received a one-time put option for the balance of their shares. (Am. Compl. ¶ 34, 46; Schacter Decl. Exh. D). Rather than permitting the plaintiffs to exercise the option at will, the parties restricted the exercise period to the three-month window between July 1 and September 30, 2005. (Am.Compl.¶ 36). Consistent with the parties' discussions on the matter, the exercise price was set forth as a function of, *inter alia, Haru* Holding's total indebtedness and consolidated cash flow. (Schacter Decl. Exh. D at 5).[4] The Stockholders' Agreement also included a merger clause that stated in pertinent part: "Except as specifically set forth herein, no party has made or relied upon any representations, warranties, covenants or understandings of any party hereto in entering into this Agreement." (Schacter Decl. Exh. D. at 12).

As a condition of closing, Matsumura agreed to serve as Haru's Vice President and Chief Operating Officer for a three-year term. In 2002, she renewed her employment agreement. (Am.Compl.¶ 49). The amended complaint alleges that, on both occasions, Dornbush's false representations induced Matsumura to accept compensation that was not commensurate with her role in Haru:

> Matsumura accepted a salary which was lower than would fully compensate her for her time and expertise, upon the representations of BNC and Dornbush in the weeks prior to her execution of her Employment Agreement that her full compensation would be realized in the value of her Put Option, and that such was based upon Haru's perform-

---

4. The Stockholders' Agreement also provided an extensive dispute resolution mechanism, which obligated Benihana and Matsumura to "promptly commence good faith negotiations with the view to resolving" any disagreements or controversy over the cash flow figures provided by Benihana and granted both parties the right to commence arbitration proceedings in the event that such efforts proved unsuccessful. (Schacter Decl. Exh. D at 7.)

ance. In 2002, Matsumura agreed to BNC's request to extend her employment agreement for three years on similar terms, again upon the representations of BNC and Dornbush that the true value of her compensation would come in the exercise of her Put Option. (Am.Compl.¶ 49). Towards the end of her second term, in November, 2004, Matsumura became concerned that Benihana was intentionally timing the expansion of Haru to coincide with the exercise period of the plaintiffs' option in order to depress the put price. (Am.Compl.¶ 63). Dornbush is alleged to have instilled false confidence in Matsumura:

> Dornbush orally assured Matsumura that this was not the result intended by Benihana, and that the Put Price formula would be interpreted to avoid this result.

> \* \* \* \* \* \*

> Upon information and belief, Dornbush confirmed that the Put Price was interpreted as "no benefit, no burden" so that in calculating the Put Price, the costs of opening the new restaurants and other financial "burdens" would not be attributed to the minority shareholders.

(Am.Compl.¶ 63, 64).

*The Plaintiffs Exercise Their Put Option*

In June, 2005, after the plaintiffs served notice of their intent to exercise their put option, Benihana valued the plaintiffs' shares at $3,717,960.20. (Am.Compl.¶ 69).

The plaintiffs maintain that Benihana's accounting treatment of the factors relevant to the put price calculation—most importantly, Haru's total debt and cash flow—violates the Stockholders' Agreement. In the alternative, since the net effect of Benihana's alleged accounting improprieties was a diminution in the value of their minority interest,[5] the plaintiffs claim that Benihana breached its fiduciary duties as a majority shareholder of Haru Holding.

More specifically, the objection to Benihana's valuation is two-fold. First, Benihana's put price calculation was premised on a "total indebtedness" figure that included a $9.2 million debt to Benihana for (i) the $8,125 million purchase price of the eighty-percent stake in Haru Holding; (ii) the legal and investment banking fees associated with the purchase; and (iii) the costs of expanding the Haru franchise in New York and Philadelphia.[6] (Am. Compl.¶ 52).[7] According to plaintiffs, the assumption of any debt by Haru was contrary to their understanding of the put option as a "no benefit no burden" bargain, which in their view required Benihana to absorb the costs (or burdens) of acquiring Haru and of expanding that business, but nonetheless share any benefits from the expansion. (Am.Compl.¶ 43, 64, 65). Second, the amended complaint alleges that substantially all of Haru Holding's cash and profits, totaling some $24 million, had been treated as transferred to Benihana. (Am.Compl.¶ 54). If true, Benihana's deci-

---

5. For example, the value of the plaintiffs' shares would increase by approximately $1.84 million if Benihana's purchase price and associated expenses were excluded from the valuation. (Pl. Opp. at 7). This estimate does not account for the remaining allegations with respect to the intercorporate transfers and debt-financed expansion, which, if factored into valuation as the plaintiffs suggest, may support a further increase in the put price.

6. These debts were not reported in Benihana's SEC filings or the Consolidated Statements of Operations, which were monthly reports of Haru's revenues and expenses generated by Benihana for Matsumura's benefit. (Am.Compl.¶¶ 61–62).

7. Under the Stockholders' Agreement, the put price was inversely related to Haru's total indebtedness and thus, an increase in total debt effected a concomitant decrease in the value of the plaintiffs' shares.

sion to finance Haru's expansion and ongoing operations with debt, rather than cash flow, further depressed the put price to the plaintiffs' detriment.[8] (Am.Compl.¶ 56, 67). In sum, these accounting arrangements are alleged to have deprived the plaintiffs of the "fair market value" of their shares, which they claim had been guaranteed to them.

This lawsuit followed unsuccessful efforts by the parties to mediate their differences.

## DISCUSSION

### I. Legal Standard

On a motion to dismiss for failure to state a claim, the issue is whether the plaintiff has established a "plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). In order to survive dismissal, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient to raise a right to relief above the speculative level," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (internal quotation marks omitted), and justify "a reasonable expectation that discovery will reveal evidence" of liability. *Bell Atlantic Corp.,* 127 S.Ct. at 1959. In making this determination, the Court is obligated to accept as true the factual allegations of the amended complaint, drawing all reasonable inferences in the light most favorable to the plaintiff. *See In re NYSE Specialists Securities Litigation,* 503 F.3d 89, 95 (2d Cir.2007). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir. 2002).

Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993).

These heightened pleading requirements are applicable to any claim that "sounds in fraud," regardless of whether fraud is an element of the claim. *Rombach v. Chang,* 355 F.3d 164, 166, 170 (2d Cir.2004). In applying this pragmatic standard to reject plaintiffs' efforts to "characterize claims by the label used in the[ir] pleading," *id.* at 172, courts in the Second Circuit have applied Rule 9(b) to any cause of action that bears a close legal relationship to fraud or mistake, *see, e.g., In re Leslie Fay Cos., Inc. Securities Litig.,* 918 F.Supp. 749, 767 (S.D.N.Y.1996) (negligent misrepresentation); *Burrell v. State Farm and Cas. Co.,* 226 F.Supp.2d 427, 438–39 (S.D.N.Y.2002) (constructive fraud), as well as to individual claims that, as pleaded, are predicated on allegations of fraud. *See, e.g., In re Parmalat Securities Litigation,* 501 F.Supp.2d at 573 (breach of fiduciary duty); *Krause v. Forex Exchange Mkt., Inc.,* 356 F.Supp.2d 332, 338 n. 49 (S.D.N.Y.2005) (aiding and abetting breach of fiduciary duty).

Moreover, where "the wording and imputations of the complaint are classically associated with fraud," Rule 9(b) governs any non-fraud claim that the plaintiffs have made "little, if any, effort to differentiate" from the fraud allegations upon which the action is predicated, *Id.* at 172; *In re Ultrafem Inc. Secs. Litig.,* 91

---

**8.** Since Benihana did not disburse any dividends, the plaintiff's, as minority shareholders, also seek a pro rata distribution of Haru's profits. (Am.Compl.¶ 54).

F.Supp.2d 678, 691 (S.D.N.Y.2000) ("Plaintiffs cannot avoid the more stringent requirements of Rule 9(b) by merely inserting boilerplate language into their complaint stating that claims are based in negligence not fraud.") (quoting *In re Stratosphere Sec. Litig.*, 1 F.Supp.2d 1096, 1104 (D.Nev.1998)). Courts are not "required to sift through allegations of fraud in search of some 'lesser included' claim." *Rombach*, 355 F.3d at 176 (citation and quotation marks omitted).

### A. Rule 9(b) Is Applicable To The Plaintiffs' Claims.

The plaintiffs fail to rebut, or even address, Dornbush's assertion that the complaint "sounds in fraud" and thus, Rule 9(b) applies to one or more of the elements of each claim. (Def. Motion at 12, 22, 23, 25; Pl. Opp. at 25, 43 n. 14, 44 n. 15, 48, 49). It is beyond cavil that plaintiffs' fraud in the inducement, constructive fraud, and negligent misrepresentation claims are subject to the rigors of Rule 9(b). The breach of fiduciary duty, and aiding and abetting breach of fiduciary duty claims are predicated on Dornbush's "false omissions and representations to deceive and to induce plaintiffs to transfer to [Benihana] the 80% interest in Haru and thereafter the right to purchase the 20% interest for less than the actual value of such interest." (Am. Compl. ¶ 107; *see also* Am. Compl. ¶ 147; Pl. Opp. at 41–42). This is a quintessential averment of fraud. Moreover, to the extent the plaintiffs have alleged a non-fraud predicate for any of their claims, they have made no effort to meaningfully distinguish the fraud allegations in the amended complaint or their opposition brief. Accordingly, Rule 9(b) applies.

### II. Analysis

### A. Dornbush's Statements Were Not Misrepresentative.

■ As noted, each of the plaintiffs' claims is premised on allegations of misrepresentations by Dornbush and thus, the falsity or misrepresentative nature of those statements lies at the heart of the amended complaint. However, the statements attributed to Dornbush were merely predictive, forward-looking statements regarding Benihana's intentions that the law does not recognize as actionable under any theory asserted here. While the plaintiffs counter that Dornbush had specific, contemporaneous knowledge of Benihana's intentions that negated the truth of each representation, which would, if true, render Dornbush's statements fraudulent, plaintiffs have utterly failed to meet the burden of pleading specific facts to support their assertion that the statements were false or misleading when made. The amended complaint pleads neither Dornbush's actual knowledge of Benihana's intentions nor any facts that might justify a strong inference of scienter. Thus, the misrepresentations alleged by the plaintiffs are not actionable and, accordingly, the amended complaint is dismissible on this basis alone.

### 1. Dornbush's Allegedly Actionable Statements Are Either Accurate Or Forward–Looking.

■ The plaintiffs must allege a legally cognizable "misrepresentation" to sustain any cause of action based thereon. It is axiomatic, however, that predictive or opinion statements about future events, without more, are not misrepresentations.[9] *See Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 74, 709 N.Y.S.2d 74, 75 (1st Dept.2000);

9. Since Dornbush's alleged fraud is the basis for the plaintiffs' breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive fraud claims, our analysis here applies with equal force to those claims.

*Hydro Investors Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 21 (2d Cir.2000); *see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187–88 (2d Cir.2004) (holding that for negligent misrepresentation claim, an alleged misrepresentation must be factual and not "promissory or related to future events."). Moreover, under New York law, a promissory statement of what will be done in the future gives rise *only* to a breach of contract cause of action. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 88–89 (2d Cir. 1992); *see also Hydro*, 227 F.3d at 21 ("The alleged negligent misstatements all relate to promised future conduct, if misstatements they be, and there is a lack of any element of misrepresentation as to an existing material fact so as to come within the doctrine of negligent misrepresentation . . . .") (quoting *Margrove Inc. v. Lincoln First Bank of Rochester*, 54 A.D.2d 1105, 1107, 388 N.Y.S.2d 958 (4th Dept. 1976)). Though misrepresentations of present or past fact have the potential to create liability for the speaker, "[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable" as such. *Brown v. Lockwood*, 76 A.D.2d 721, 432 N.Y.S.2d 186, 194 (1980); *Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384, 387 (S.D.N.Y. 1983).

The statements allegedly made by Dornbush may be grouped as follows: (i) the Stockholders' Agreement was a "no benefit no burden" bargain in which the costs of acquiring Haru Holding as well as expanding the Haru franchise would be borne by Benihana (Am.Compl.¶¶ 30, 43, 63, 64),;[10] (ii) the Stockholders' Agreement provided that Haru Holding would remain debt-free (Am.Compl.¶ 17); (iii) the exercise price of the put option would represent the "fair market value" of the plaintiffs' shares (Am. Compl.¶¶ 29, 42, 43);[11] and (iv) the put option would enable the plaintiffs to share in the proceeds from new restaurant openings (Am.Compl.¶¶ 30, 49).

Each of these statements conveys Dornbush's expectations of how Benihana *would* perform under the Stockholders'

**10.** We question the plaintiffs' interpretation of "no benefit no burden," which wholly ignores the "no benefit" portion of this phrase. The most charitable understanding of "no benefit no burden" is that the plaintiffs, through the put price of their shares, would not be forced to assume any financial burdens if, and only if, they failed to realize any benefits under the put option.

Since the value of the plaintiffs' interest in Haru Holding seems to have appreciated by at least forty-five percent (from $2,031 million to $3,125 million), the plaintiffs have clearly benefited from Benihana's ownership and control. Even in the light most favorable to the plaintiffs, it would not seem an unreasonable application of a "no benefit no burden" arrangement to, factor into the put price the costs of operating and expanding the Haru franchise, thus requiring the plaintiffs to bear their share of the financial burdens associated with the benefits they reaped.

Our observation here is supported by the text of the Stockholders' Agreement, which expressly includes the "Amount of Company Debt" as a factor in the put price calculation. (Schacter Decl. Exh. D at 2). Though the parties clearly contemplated that Haru could (and would) assume some long-term debt, we offer no guidance on whether any particular debt-financing arrangements were permissible.

**11.** The benchmark against which the plaintiffs measure the amount of consideration received in exchange for their shares is "fair market value." Though "fair market value" appears as a refrain in the amended complaint and the opposition brief, the plaintiffs have neither defined that phrase in terms that are not circular, nor identified the source of Benihana's duty to compensate them with "fair market value." Indeed, as discussed *supra*, the parties considered, but rejected, the notion of valuing the plaintiffs' shares in terms of "fair market value," opting instead for a more precise formula for calculating the put price.

Agreement and not his representation of a present or past fact bearing on the transaction.[12] Indeed, in the contract claim for breach of contract which plaintiffs assert against Benihana in this action, plaintiffs maintains that if the Stockholders' Agreement, as drafted, is properly understood, it would preclude the assumption of debt by Haru, require Benihana to bear the costs of acquisition and expansion, and entitle the plaintiffs to the fair market value of their shares. Moreover, the parties, each represented by their own counsel, deliberated and negotiated for several months before executing the Stockholders' Agreement, which explicitly provides a mechanism for pricing the plaintiffs' put option. To the extent that Dornbush's representations could be understood as "promissory," i.e. pledging any particular performance on Benihana's behalf, we express no opinion on whether the plaintiffs could predicate a breach of contract claim on the basis of his oral representations or whether the statements would be admissible as parol evidence and hold only that they are not separately actionable under any of theories asserted here.

Dornbush's suggestion that the plaintiffs would reap the benefits of new restaurant openings fails to state a claim for a second reason. Setting aside the predictive nature of this statement, the plaintiffs do not dispute the fact that Benihana's $3.7 million valuation represents an appreciation in value brought about, at least in part, by revenue from the new Haru restaurants. Since Dornbush's representation does not even endeavor to address the degree to which the plaintiffs would be able to capture the benefits of expansion, we fail to see how his statement could be interpreted as untrue.[13]

12. The plaintiffs contend that, where a fiduciary relationship has been properly alleged, statements of opinion that are insufficient to support a fraud claim will nonetheless support a breach of fiduciary duty claim. (Pl. Opp. at 44). This argument misses the mark for many reasons.

At the outset, plaintiffs' argument conveniently downplays the facts that plaintiffs had engaged their own counsel and Dornbush was clearly Benihana's attorney. Moreover, as we noted *supra* Section I.A, the plaintiffs' breach of fiduciary duty claim is grounded in Dornbush's allegedly fraudulent conduct. Thus, Dornbush's liability on the breach of fiduciary duty claim is judged based on whether his statements constitute fraud, and not some 'lesser included' breach of fiduciary duty.

Even if were to set aside these observations, in the principal case cited for the plaintiffs' proposition, *In re Levy's Estate*, the court noted only that *"misrepresentations* of legal opinion" by a party possessing "superior knowledge" may be actionable. 19 A.D.2d 413, 417, 244 N.Y.S.2d 22, 28 (1st Dept.1963) (emphasis added). That is not this case. Even if we were to ignore the fact that the plaintiffs were represented by separate counsel who could have corrected any misrepresentations of legal opinion, under *In re Levy's Estate*, the

plaintiffs cannot avoid the need to establish (i) a legally cognizable misrepresentation; or (ii) Dornbush's knowledge of the falsity or misleading character of his statements.

Though the plaintiffs suffer from no misapprehension as to Dornbush's role in the transaction—they readily admit that he was Benihana's agent and do not allege the existence of an attorney—client relationship with respect to the Haru acquisition—they nonetheless seek to hold Dornbush accountable for his statements as if he was their attorney.

Dornbush's conduct is not subject to the reasonable attorney standard because, assuming that he was a fiduciary to the plaintiffs, the scope of Dornbush's duties was not coextensive with those of an attorney representing a client.

13. The plaintiffs further allege that Dornbush falsely represented that "the parties would negotiate in good faith in the event of a dispute." (Am.Compl.¶ 94). This statement cannot support a claim because it is no less predictive or promissory than those discussed *supra*. Moreover, this conclusory allegation fails to meet the particularity requirements of Rule 9(b) for not detailing when and where the statement was made.

**2. The Facts Alleged Do Not Give Rise To A 'Strong Inference' Of Scienter.**

 Of course, a prediction or statement of opinion may be actionable as fraud if the speaker has knowledge of the inevitability of the future event not transpiring because, for example, the promisor has no intention of tendering performance. *See Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262–63, 151 N.E.2d 833 (1958); *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 716–17, 143 N.E.2d 906 (1957). However, the amended complaint fails to sufficiently allege that Dornbush had contemporaneous knowledge of Benihana's intention not to perform in accordance with his representations.

 Though a speaker's state of mind may be averred generally, a plaintiff's supporting factual allegations must give rise to a "strong inference" of scienter. *See In re Parmalat Securities Litigation*, 501 F.Supp.2d 560, 573 (S.D.N.Y.2007). To establish the requisite inference of Dornbush's knowledge, plaintiffs must plead facts that (1) demonstrate the defendant's motive and opportunity to commit or assist in the fraud, or (2) constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness. *See Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir.1995). The strength of the circumstantial evidence of a defendant's recklessness or conscious misbehavior must be "correspondingly greater" than that which suffices to show motive. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). "A complaint will survive . . . only if a reasonable person would deem the inference of scien-

ter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, —— U.S. ——, ——, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007) (construing the term "strong inference" in the Private Securities Litigation Reform Act of 1995 (PSLRA)).

Plaintiffs have not adduced any facts probative of Dornbush's motive to commit fraud other than his position as a director of Benihana.[14] Under Second Circuit precedent, however, motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak v. Kasaks*, 216 F.3d 300, 310–11 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Plaintiffs cannot demonstrate Dornbush's motive by pointing merely to incentives possessed by nearly all corporate insiders, such as "the desire to maintain a high corporate credit rating . . . or otherwise to sustain the appearance of corporate profitability or of the success of an investment . . . and . . . the desire to maintain a high stock price in order to increase executive compensation . . . or prolong the benefits of holding corporate office." *Id.*

We next consider whether the plaintiffs have satisfied the alternative, "conscious disregard or recklessness" prong of pleading scienter. Though allegations of a defendant's knowledge of or access to information contradicting his statements are adequate to establish recklessness, *see Novak*, 216 F.3d at 310–11, it is well-established that a corporate officer or director by virtue of his status cannot, without more, be charged with knowledge of activities within the corporation. *See, e.g., In re Forest Laboratories, Inc. Derivative Liti-*

---

**14.** Neither Dornbush nor the plaintiffs have briefed the issue of whether Dornbush had the opportunity to commit the alleged fraud.

*gation,* 450 F.Supp.2d 379 (S.D.N.Y.2006); *In re Keyspan Corp. Securities Litigation,* 383 F.Supp.2d 358 (E.D.N.Y.2003); *Jacobs v. Coopers & Lybrand, LLP,* No. 97 Civ. 3374, 1999 WL 101772, **15–17, 1999 U.S. Dist. LEXIS 2102, at *45–48 (S.D.N.Y. Feb. 26, 1999); *Boley v. Pineloch Associates, Ltd.,* No. 87 CIV. 5124, 1990 WL 113201 (S.D.N.Y. Aug.2, 1990); *see also Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). Here, the plaintiffs concede their inability to plead Dornbush's actual knowledge of Benihana's intent but, as before, seek an inference of knowledge based on his position of "considerable authority" within Benihana.[15] This is facially insufficient given the persuasive authority rejecting the imputation of knowledge from a corporation to its officers and directors.

Moreover, the plaintiffs have failed to allege a factual basis for Dornbush's access to information negating the truth of his representations that might compel a contrary result. Haru's loan obligations were not reported in either Benihana's publicly-available financial statements or the monthly statements of Haru operations created by Benihana and provided to Matsumura. The amended complaint does not aver Dornbush's involvement in managing the company's finances and operations. Nor have the plaintiffs alleged any facts to suggest that Benihana's intentions with respect to the Stockholders' Agreement were, or could have been, common knowledge among Benihana's officers and directors.[16] Indeed, there is every reason to believe that Dornbush could not have had contemporaneous knowledge, some six years earlier, of Benihana's intentions because the decision to treat the costs of the acquisition and expansion as a debt of Haru occurred in the valuation process when the plaintiffs exercised their put option and not before. *See Tellabs, Inc.,* 127 S.Ct. at 2510. (inference of intent "must be cogent and compelling, thus strong in light of other explanations").[17]

Accordingly, the plaintiffs' failure to adequately support a strong inference of Dornbush's state of mind warrants dismissal of the amended complaint in its entirety.

## B. The Plaintiffs' Reliance On Dornbush's Statements Was Not Reasonable.

◼ A plaintiff must prove reasonable reliance to recover on a claim for fraud in the inducement, constructive fraud, or negligent misrepresentation. *See, e.g., King v. Crossland Savs. Bank,* 111 F.3d 251, 257–58 (2d Cir.1997); *Christie's Inc. v. Dominica Holding Corp.,* No. 05 Civ. 8728, 2006 WL 2012607, *4, 2006 U.S. Dist. LEXIS 49251, at *14 (S.D.N.Y. July 18, 2006); *Burrell v. State Farm and Cas. Co.,*

---

15. At oral argument on the defendants' motions to dismiss, counsel for the plaintiffs conceded that "the most that plaintiffs can say is that Mr. Dornbush was in a position of considerable authority at Benihana, [as] general counsel and a director, and that to the extent that there would be such knowledge, such knowledge would be inferred.... I don't believe we pleaded specific actual knowledge." (Oral Arg. Tr. at 43:3–10).

16. Benihana's intentions could have been common knowledge if, for example, its decision with respect to the put price valuation was crucial to its competitive success. *See,* *e.g., Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989).

17. To avoid dismissal of the plaintiffs aiding and abetting breach of fiduciary duty claim, the plaintiffs must allege that the "defendant had actual knowledge of the breach of duty." *Kaufman v. Cohen,* 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dept.2003); *accord In re Sharp Int'l Corp.,* 403 F.3d 43, 49 (2d Cir.2005). Our conclusions with the respect to the insufficiency of the allegations in support of Dornbush's scienter apply with equal force to the actual knowledge element of the plaintiffs' aiding and abetting claim.

226 F.Supp.2d 427, 438 (S.D.N.Y.2002). In evaluating whether the plaintiffs' reliance was reasonable, the entire context of the transaction is considered "including factors such as its complexity and magnitude, the sophistication of the parties, and the contents of any agreements between them." *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003). When plaintiffs are sophisticated parties and the statement relates to a business transaction memorialized in a contract, New York courts are reluctant to find reliance on oral communications to be reasonable. *See id.* at 196; *Lazard Freres & Co. v. Protective Life Insurance Co.,* 108 F.3d 1531, 1543 (2d Cir.1997). This reluctance stems from the view that "a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." *Emergent Capital,* 343 F.3d at 195 (citation omitted); *Harsco Corp. v. Segui,* 91 F.3d 337, 342–43 (2d Cir.1996).

Skepticism of fraud claims in this context is obviously compounded when the plaintiff alleges reliance on opposing counsel's opinion or advice, and not a representation of fact. Courts have routinely held that it is unreasonable for a party "to rely on the advice of adversary counsel . . . when both parties are aware that adverse interests are being pursued." *Kregos v. Associated Press,* 3 F.3d 656, 665 (2d Cir. 1993); *I.L.G.W.U. Nat'l Ret. Fund v. Cuddlecoat, Inc.,* No. 01 Civ. 4019, 2004 WL 444071, *3, 2004 U.S. Dist. LEXIS 3764, at *9 (S.D.N.Y. Mar. 11, 2004); *Petrello v. White,* 412 F.Supp.2d 215, 227 (E.D.N.Y. 2006); *see also Russell–Stanley Holdings, Inc. v. Buonanno,* 327 F.Supp.2d 252, 257 (S.D.N.Y.2002).

Here, plaintiffs are sophisticated entrepreneurs who built a successful restaurant franchise in one of the most challenging markets in the country and managed numerous other restaurant ventures. Benihana was proposing an $8.125 million purchase of a controlling interest in the Haru franchise. Prior to negotiating any specific terms of the acquisition or drafting any documents, Dornbush clearly communicated to the plaintiffs that he could not represent them in the transaction and recommended another attorney, Paikin, who was then retained by the plaintiffs. The parties negotiated the terms of the Haru acquisition for several months and the resulting Stockholders' Agreement was a complex, comprehensive and fully integrated contract. Over the course of their discussions, Benihana drew attention to the issue of the put price valuation by suggesting that "fair market value" was too "nebulous" and suggested a specific formula for calculating the put price, which was eventually incorporated into the Stockholders' Agreement.

Under these circumstances, the decision to rely upon Dornbush's opinion with respect to the interpretation of the Stockholders' Agreement or Benihana's performance under that contract was unreasonable. We find incredible, and unjustifiable if true, that such sophisticated plaintiffs treated the retention of their own attorney, Paikin, as a "mere formality" and failed to confirm with him that the express provisions of the Stockholders' Agreement adequately protected their interests. Benihana had certainly placed the plaintiffs on notice that the details of the put price valuation were of significant concern to them. If the plaintiffs had felt that the precise formula used in the Stockholders' Agreement was inartfully drafted or failed to account for their apprehensions about the imposition of debt and acquisition costs on Haru, they could have protected themselves by inserting appropriate language into that agreement. Moreover, the merger clause reflects the parties' intention to make the

Stockholders' Agreement complete and comprehensive, and further undermines as a matter of law the reasonableness of plaintiffs' asserted reliance on Dornbush's oral representations.

The plaintiffs have not addressed the reasonableness of their reliance on Dornbush's statements except to repeat their arguments in support of the existence of a fiduciary duty. The fact that Dornbush had a pre-existing attorney-client relationship with the plaintiffs or that he advised the plaintiffs on several ancillary matters while the negotiations with Benihana were ongoing does little to mitigate the circumstances surrounding the sale that negate the reasonableness of their reliance. Dornbush's suggestion to hire an independent attorney should have alerted the plaintiffs to the adversarial nature of the ensuing negotiations. If the plaintiffs failed to avail themselves of their own attorney, it is no one's fault but their own; and if he failed to adequately represent them, legal responsibility may not be shifted to Dornbush, who represented the plaintiffs' adversary in the transaction.[18]

### C. The Plaintiffs Have Not Alleged A Fiduciary Relationship.

In order to sustain a claim for breach of fiduciary duty, constructive fraud, or negligent misrepresentation, a plaintiff must allege the existence of a fiduciary or special relationship with the defendant. *See, e.g., Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.,* No. 03 Civ. 5539(NRB), 2004 WL 1444868 at *8 (S.D.N.Y. June 24, 2004); *Petrello,* 412 F.Supp.2d at 229; *Steed Fin. LDC v. Nomura Sec. Int'l. Inc.,* No. 00 Civ. 8058, 2004 WL 2072536, at *10 (S.D.N.Y. Sept. 14, 2004). Of particular relevance to this case, a fiduciary or im-

plied attorney-client relationship may be triggered when a putative client submits "confidential information to a lawyer with the reasonable belief that the lawyer was acting as his attorney." *Diversified Group, Inc. v. Daugerdas,* 139 F.Supp.2d 445, 454 (S.D.N.Y.2001). A party's "unilateral belief" that he is represented by counsel "does not confer upon him the status of client unless there is a reasonable basis for his belief." *Knigge ex rel. Corvese v. Corvese,* No. 01 CIV. 5743, 2001 WL 830669, at *3 (S.D.N.Y. July 23, 2001) (internal citations and quotation marks omitted).

The reasonableness of a belief that an attorney-client or fiduciary relationship has been formed often turns on whether the plaintiff was explicitly instructed to obtain outside counsel. In *Croce v. Kurnit,* the court was persuaded that the attorney owed a fiduciary duty to the plaintiff in large part because of his "failure to advise the Croces to obtain counsel." 565 F.Supp. 884, 890 (S.D.N.Y.1982). Likewise, in *Richardson v. Artrageous, Inc.,* the defendant-attorney was held to be a fiduciary because the circumstances surrounding his interaction with plaintiff gave rise to the foreseeable expectation of a fiduciary relationship, which obligated him to either accept his role as her attorney or "advise her to obtain independent counsel." No. 93 Civ. 5221, 1994 WL 97222, at *3 (S.D.N.Y. Mar.18, 1994); *see also Howard v. Murray,* 43 N.Y.2d 417, 422, 401 N.Y.S.2d 781, 372 N.E.2d 568 (1977) ("Any doubts on this point should readily have been resolved against the defendant, absent proof of a clear and forthright statement to his clients that he was no longer their attorney and that they should obtain outside counsel before continuing any ne-

---

**18.** Counsel for the plaintiffs has indicated that any claims against Paiken would be barred by the applicable statute of limitations.

gotiations."). Thus, in both cases, the court recognized that the suggestion to retain independent counsel is a repudiation of any special or fiduciary relationship and a powerful indicator that the attorney's interests are not aligned with those of the putative client.

██ The plaintiffs have failed to demonstrate the existence of a fiduciary relationship during the August to December, 1999 period in which Dornbush is alleged to have made two misrepresentations as to the put price valuation. (Am.Compl.¶¶ 42, 43) It is undisputed that, sometime in July, 1999 and after some preliminary discussions regarding the Haru acquisition, and before any documents were signed, Dornbush advised the plaintiffs to obtain separate counsel. The plaintiffs followed Dornbush's advice and retained Paikin, who acted as their legal counsel until the Stockholders' Agreement was executed in December, 1999. On these facts, we fail to see any basis for a fiduciary relationship given that Dornbush quashed any reasonable belief that he would be the plaintiffs' attorney or represent their interests in the transaction by suggesting that they hire Paikin. The plaintiffs have not cited any authority for the proposition that opposing counsel may owe fiduciary duties to an adversary who is independently represented and we decline to so hold.

The plaintiffs allege that Dornbush's continuing representation with respect to other Haru-related matters led them to believe "that the role of the new attorney was as a formality." (Am.Compl.¶ 19). As a threshold matter, this subjective and "unilateral" belief that Dornbush would act in the interests of the plaintiffs is insufficient to give rise to a fiduciary relationship. More to the point, however, the fact that Dornbush continued to advise the plaintiffs on matters unrelated to negotiating and drafting the terms of the Stockholders' Agreement cannot be objectively understood as evidence of Dornbush's retreat from his earlier position that the plaintiffs should be independently represented in their dealings with Benihana. Indeed, the plaintiffs have failed to allege any objective manifestations of his intent to do so, such as, advocating on their behalf instead of Benihana's. Our conclusion here is further supported by the sophistication of the parties and the complexity of the transaction, which, as we noted *supra* Section II.B, dramatically increases the likelihood of a reasonable person under the circumstances acknowledging the shift in the parties' relationship once Dornbush had asked the plaintiffs to obtain separate counsel.

## CONCLUSION

To summarize, the statements upon which plaintiffs ground their claims against Dornbush are not actionable as a matter of law. Nor have plaintiffs approached adequately pleading knowledge or the requisite scienter on Dornbush's part to transform predictive statements into falsehoods. Moreover, plaintiffs who were represented by their own counsel in accordance with Dornbush's advice, have not pleaded reasonable reliance or the existence of a fiduciary duty. For these reasons, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), Dornbush's motion to dismiss the amended complaint is granted in its entirety.

**IT IS SO ORDERED.**